257 So.2d 193 (1972)
J.W. WOOD
v.
STATE of Mississippi.
No. 46577.
Supreme Court of Mississippi.
January 17, 1972.
*194 Travis Buckley, Laurel, Thomas G. Roberts, Bay Springs, L. Percy Quinn, Laurel, John Sims, Heidelberg, for appellant.
A.F. Summer, Atty. Gen. by John Kinard, Sp. Asst. Atty. Gen., Jackson, for appellee.
PATTERSON, Justice:
J.W. Wood was tried in the Circuit Court of the Second Judicial District of Jasper County for the murder of Robert Lee Williams. He was found guilty of manslaughter and sentenced to serve twelve years in the penitentiary. From that verdict and sentence he appeals.
The record discloses that on the evening of September 19, 1970, Billy Ray Williams visited with his brother, Robert Lee, and his wife Lucille. During the visit Robert Lee's stepson and two other boys arrived and stated that several shots had been fired at them from the residence of Mrs. Shep Boyd.
Robert Lee, enraged by this statement, journeyed to the home of Mrs. Boyd, his brother Billy Ray accompanying him. Billy Ray testified that his brother carried a pistol with him for protection and that he, the witness, had an automatic shotgun. He denied, however, that either of them had a club, or blackjack as it was sometimes described, with them.
Upon arriving at the Boyd residence they found, according to Billy Ray, J.W. Wood, Mrs. Boyd, Rheta Boyd and Donald Ray Boyd upon the porch of the residence. Billy Ray stated that his brother got out of the car and asked J.W. Wood, the appellant, who had been shooting at his stepson and that Wood responded by grabbing a chain and exclaiming, "I'll show you something, you goddam son-of-a-bitch," whereupon Robert Lee obtained his pistol from the car. He further testified that the two men then agreed to settle the matter without weapons. He stated, however, that once Robert Lee had disposed of his pistol, the appellant struck his brother with the chain and a struggle ensued. The testimony of Billy Ray indicates that Robert Lee got the best of the altercation and was returning the few steps to his automobile, apparently feeling the battle over, when he was shot. The witness stated that he had his back to the arena at the time, but upon hearing the shot turned to see his brother upon the ground and to observe the accused drop a shotgun and flee the scene. He was positive that Robert Lee did not have a pistol in his hand when he was shot since it was upon the seat of the car.
*195 The remaining witnesses for the State were a doctor, who testified that the wound Robert Lee received from the shot was the cause of his death and the sheriff, who testified that upon examining the scene of the fight he found a pistol, a shotgun and a wooden club.
The defendant introduced Mrs. Robert Lee Williams as a witness. She is the widow of the decedent and also the sister of the appellant. She related the conversation of her son and the other boys with reference to shots being fired at them from the Boyd residence. She further testified that her husband and his brother, Billy Ray, left their home to go to the Boyd residence to investigate the matter and that they were armed with a pistol, a shotgun and a club. She identified the club and the pistol found by the sheriff as the ones in the possession of her husband when he departed for the Boyd residence.
Mrs. Lillie Mae Boyd testified for the defendant. She stated that the Williams brothers drove into the driveway of her home and parked their automobile a short distance from that of the defendant. Upon alighting from the car Robert Lee had a pistol in his hand and pointed it at the defendant exclaiming, "You blond-headed son-of-a-bitch, me or you one's going to get whipped," whereupon she requested Robert Lee to leave since she feared that there would be trouble. Her request being ignored, she testified that appellant then approached Robert Lee who reached into his car, obtained a club and struck the appellant a blow, knocking him to the ground. Whereupon she entered the house and observed no more of the fracas though she did hear a shot fired. Upon returning to the porch subsequent to the shot she saw that Billy Ray had gotten his brother into the car and that the defendant was lying bleeding on the edge of her porch. She stated that after administering first aid to the defendant, her son carried him to the hospital. She was positive in her testimony that the Williams brothers started the fight and that Robert Lee struck the first blow. She was equally certain that the defendant was not armed with a chain at the time.
The next witness for the defendant was Donald Ray Boyd, son of the foregoing witness, who was nineteen years of age. His testimony was in accord with that of his mother, but was of greater importance since he witnessed the whole affray. He testified that Robert Lee struck the appellant with a club, knocking him to the ground and that when he regained his feet, he was again knocked to the ground and further beaten. He stated the appellant crawled away from his assailant, moving toward his car. At about the same time Robert Lee obtained his pistol from the seat of his car and pointed it toward the appellant who then seized a gun from his, appellant's, car and shot Robert Lee. He stated that immediately thereafter the appellant dropped the gun, ran to the side of the porch and fell down and that Billy Ray got his brother into the car and departed. He was positive the appellant did not have a chain at the time and that Robert Lee not only started the fight, but had a pistol in his hand when shot.
Billy Ray Williams testified as a rebuttal witness for the State. He stated that the pistol found upon the ground by the sheriff must have fallen from the car when he was attempting to aid his wounded brother and denied that his brother had a wooden club on the occasion.
The conflict of evidence is set out so that the assignments of error may be viewed from a proper perspective. The most cogent is that the trial court permitted the State to improperly impeach the defendant's witnesses on irrelevant matters. This necessitates review of some of the testimony and the method used to impeach them.
The first question by the State's attorney on the cross-examination of Mrs. Lucille Williams was:
"Q. Lucille, how many divorce cases have I represented you on?
"A. One.
*196 "Q. How many times have you been married?
"MR. ROBERTS: We object, if the Court please.
"THE COURT: Overruled."
Later, with reference to whether the witness, the widow of the decedent and sister of the defendant, would like to see her brother go free, responded that the decision was not hers to make, whereupon the following questions were asked:
"Q. Mrs. Williams, how much insurance did you collect at the death of your husband?
"MR. ROBERTS: We object, if the Court please.
"THE COURT: Sustained.
"Q. How much Social Security do you draw for yourself and your children now?
"MR. ROBERTS: We object.
"THE COURT: Sustained.
"Q. Have you or not bought a new trailer since your husband's death?
"A. Yes, sir.
"MR. ROBERTS: Objection.
"Q. And how much did you pay for that trailer?
"MR. ROBERTS: We object, if the Court please.
"THE COURT: Sustained."
Mrs. Williams was also asked why she did not want her husband to go to the Boyd place on the day of the fight and responded that she asked her husband to call the sheriff and let him tend to it. Thereafter, the following colloquy transpired:
"Q. Mrs. Williams, I want to ask you about the reputation of this Boyd place.
"MR. ROBERTS: If the Court please, we object to that.
"THE COURT: Let him ask the question.

* * * * * *
"Q. Mrs. Williams, what is the general reputation of this Boyd place as for morality and immorality, is it good or bad?
"A. I have heard people talk about it.
"Q. That's what I'm asking, that's reputation, Mrs. Williams. Is that talk that you have heard good or bad?
"MR. ROBERTS: We object, if the Court please.
"THE COURT: Overruled.
"Q. Is it good or bad?
"A. Well, some of it's good and some of it's bad.
"Q. Some of it's good and some of it's bad. What have you ever heard good about the Boyd place, Mrs. Williams?
"MR. ROBERTS: We object, if the Court please.
"MR. ULMER: She said some was good and some was bad.
"THE COURT: Overruled.
"Q. What have you ever heard good about that Boyd place over there?
"A. Well, I just know she tries to keep her sick mother and everything, I just 
"Q. You know they drink beer over there too, don't you?
"A. I hadn't never been over there to see.
"Q. You've heard they do though, haven't you?
"A. Yes.
"MR. ROBERTS: Objection.
"THE COURT: Overruled.
"Q. And you've heard they do something else over there too, don't they, Mrs. Williams?
*197 "A. Yes, sir.
"Q. And they're doing something over there that men congregate over there, don't they, Mrs. Williams?
"A. Yes, sir.
"Q. Say it so the jury can hear you.
"A. Yes, sir.
"Q. They do it, don't they? As a matter of fact, you were very uneasy about your son's going to that place?
"A. No, sir, my son never did go over there very much."
Mrs. Lillie Mae Boyd was subjected to a similar type of cross-examination. She was asked when she was last in trouble with the youth court, to which she responded "about a month ago." It was then brought out that her daughter was confined by the youth court to the Columbia Training School. The following questions were asked:
"Q. And was she put there by the youth court?
"A. Yes, sir.
"Q. Okay. Is it not a fact that the youth court ruled that that home was not a proper place to raise that child?
"A. Yes, sir, I guess.
"Q. That's exactly what it ruled, didn't it? Now, tell me why it is that that place is not a fit place to raise a child.
"A. Well, I stay at home with my kids and I send them to school.
"Q. Is that the reason he sent her down to Columbia?
"A. No, sir.
"Q. What is the reason he sent her down there?
"A. Cause 
"MR. SIMS: We object, if the Court please.
"THE COURT: Overruled, it has some bearing about the environment.
"Q. Answer the question.
"A. Because that she left the school-house and all."
She was further questioned:
"Q. He paroled her out to live with you in that home down there, didn't he?
"A. Yes, sir.
"Q. And later on he changed his mind, didn't he?
"A. Yes, sir.
"Q. Alright, and the reason he changed his mind was because that house was not a fit place to bring up that child, was it?
"A. I don't know how come him to change his mind.
"Q. Uh hum. That was the court's ruling, wasn't it?
"A. Yes, sir."
These questions were objected to and overruled by the court.
Donald Ray Boyd was asked on cross-examination the following questions to which no objection was made:
"Q. Donald Ray, have you ever been in jail?
"A. Yes, sir.
"Q. Where?
"A. I've been in jail up here, I've been in jail in Hattiesburg, I've been in jail in Laurel.
"Q. Alright, sir. Are you now in the jurisdiction of the youth court?
"A. No, sir.
"Q. You are not having to make reports to the youth court in Jasper County?
"A. Yes, sir.
*198 "Q. Why are you having to make these reports?
"A. Well, they're trying to send my wife to that school down there and I'm having to make reports for her.
"Q. Who is your wife?
"A. Shirley Ann Boyd."
He was questioned if he was not drinking beer on the occasion of the fight which he admitted. He was immediately thereafter asked if he had not told the judge in a previous youth court hearing that he did not drink beer.
The witnesses were obviously interrogated on cross-examination about matters immaterial to the issue. They were discredited, or subject to being discredited, by the prejudicial inferences that might have been drawn by the jury from the repeated questions. It could be argued that a single question of a prejudicial nature would not be sufficient to require reversal, but the case before us is not of such nature. The purpose of the repeated questions could only have been to prejudice the jury by innuendo. The question appertaining to the number of marriages of Mrs. Williams was totally immaterial to the issue. The question which inferred that she benefited from her husband's death and therefore wanted her brother to be acquitted, though objections were sustained thereto, were nevertheless four times repeated and could serve no purpose but to discredit her testimony in the eyes of the jury in spite of the court's ruling.
Similarly the question directed to Mrs. Boyd as to whether she had a daughter in the Columbia Training School, immediately followed by another that the daughter had been paroled to the Boyd home and the parole thereafter revoked, which was in turn followed by a statement of the prosecuting attorney that the Boyd home was a place where men congregated, was likewise immaterial to the issue and could only have been used for the purpose of impeaching the credibility of this witness upon an immaterial issue prejudicial to the defendant.
The cross-examination of Donald Ray Boyd relating to his having been in jail was likewise error. He was not interrogated as to whether he had been convicted of a crime, the customary mode of discrediting or impeaching a witness; instead the device of impeaching by inference stemming from an improper question was used. Additionally, he was asked, after it was established that he had consumed some beer on the day of the fight, whether he had previously told a youth court judge that he did not drink beer. The inference resulting from this question is that the witness uttered a falsehood on either one occasion or the other. The consumption of beer by the witness was totally irrelevant to the issue of murder and was prejudicial to the defendant.
The question for this Court to decide is: Was the defendant, who was being tried for murder, accorded a fair trial in harmony with the decisions of this Court and the requirements of due process of law?
In Brooks v. State, 209 Miss. 150, 155-156, 46 So.2d 94, 97 (1950), we cited with approval and thus adopted the language of the United States Supreme Court in Lisenba v. People of the State of California, 314 U.S. 219, 62 S.Ct. 280, 85 L.Ed. 166 (1941), establishing the standard by which due process is measured with regard to fundamental unfairness in the use of evidence. It is:
"* * * The aim of the requirement of due process is * * * to prevent fundamental unfairness in the use of evidence whether true or false." And again they said: "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial * * *."
Fairness cannot be adjudged by an individual's notions of what it comprises. It must *199 be determined by considering the precedent opinions of this or other courts as the standard. In Manning v. State, 188 Miss. 393, 398, 195 So. 319, 320 (1940), the impeachment of a witness was stated to be accomplished in four modes, and in four only:
... (1) By cross-examination; (2) by proving his previous contradictory statements or acts; (3) by proof of his conviction of a criminal offense; and (4) by adducing general evidence tending to show that he is unworthy of belief on his oath. And some authorities add a fifth: By physical demonstration or experiment properly conducted... .
In comparing these modes with the method used by the State to impeach the credibility of the defendant's witnesses it is observed that the impeachment was attempted largely by cross-examination. This was not directed to impeachment by way of false swearing, other than the question relating to the consumption of beer by Boyd, but rather by discrediting the witnesses by repeated questions directed either to the immorality of the witnesses or to the financial gain to Mrs. Williams occasioned by the death of her husband.
In Smith v. State, 58 Miss. 867 (1881), questions similar to those propounded in this case were considered by the Court, the objects of the questions there being to attack the credibility of the witness by showing the immorality of her previous life as well as some circumstances calculated to induce the jury to suspect her of complicity in the murder of her husband or at least that she sympathized with those accused of his murder. It was held that evidence as to the character of the witness must be confined to character for veracity, citing with approval the anonymous case of "37 Miss. 54." This case, a bastardy proceeding, held that it was competent to ask the prosecutrix whether or not at about the period of conception she had intercourse with persons other than the defendant, but that it was impermissible to investigate her conduct or character at any other period of her life because her chastity or want of it could not affect the issue then being tried. It was held that this testimony was not admissible to impeach her credibility as a witness. In McMasters v. State, 81 Miss. 374, 376, 33 So. 2 (1902), a murder case, the lower court was reversed for permitting the introduction of improper evidence. This Court stated:
... The wife of defendant, Mrs. Nan McMasters, was an important witness for him, and we think it was error to permit the district attorney to develop to the jury, in cross-examining her, that she was the mother of two children not born in wedlock. This had no relevancy to the issue, and was too heavy a load to put on defendant before an average jury in so grave a trial.
In Cody v. State, 167 Miss. 150, 166, 148 So. 627, 632 (1933), a trial for homicide, in which the lower court was affirmed, the following rule was announced with regard to cross-examination of witnesses in order to show bias or motives. It was held:
... A wide latitude is allowed on cross-examination to show bias or motives for the purpose of affecting the credibility. The rule with reference to contradicting a witness is not the same as what may be asked on cross-examination. In order to impeach a witness, the testimony about which the witness is to be impeached must be material to the issue and must be of such character as would be relevant to the issue being tried; but when it comes to bias, friendship, motive, or hostility, a witness may be cross-examined as affecting his or her credibility as a witness... .
No opinions do we find, however, that permit such a wide latitude on cross-examination to establish motive or bias as is portrayed by the record herein.
In Coleman v. State, 198 Miss. 519, 522-523, 23 So.2d 404, 405 (1945), a case of attempted arson, Justice Griffith, in commenting *200 upon the motive for the attempted arson, established by the witnesses to be jealousy, it appearing that the appellant was intensely enamored of a man believed by her to be in the house with another woman, motivating her to burn the house, stated:
We do not pursue the details except to say that at points in this record it is difficult to tell whether the prosecution was for the attempted arson laid in the indictment, or whether for unlawful cohabitation, or whether the arraignment was for immorality in general.
Appellant's counsel vigorously objected to all this collateral and excessive matter, and repeatedly did so without avail. Incompetent evidence pressed upon the jury as this was, especially if of an inflammatory character, is presumed to have been harmful, and it is only when we can say with confidence that it had, in all probability or likelihood no such effect that we may decline to reverse on account of it. This record does not present a case so conclusive of guilt that we may assume to say that what was done here was of no harm, with the result that the judgment must be reversed and the case remanded for a proper trial.
See also Cofer v. State, 158 Miss. 493, 130 So. 511 (1930); Brooks, supra, and more recently Johns v. State, Miss., 255 So.2d 322, decided December 6, 1971, with reference to prejudice arising from improper questions propounded to a defendant or witnesses as to whether they were "charged" with a crime rather than being "convicted" of a crime.
In returning to the question of whether the defendant was accorded due process of law, a fair trial, we are constrained to the opinion from a comprehensive review of the record that he was not. The case is very close on the facts. We are therefore of the opinion that the prejudicial inferences that could be and probably were drawn from the incompetent evidence on matters foreign to the issue must be presumed to be harmful. Coleman, supra.
We are aware that objections were interposed and sustained to some of the questions propounded to Mrs. Williams. Nevertheless, in Barlow v. State, 233 So.2d 829 (Miss. 1970), we held that it was error to ask questions requiring prejudicial answers, though objections were sustained thereto, since they had the effect of prejudicing the jury. We note also that no objection was made to the testimony of Donald Ray Boyd when he was asked whether he had ever been in jail. However, it was stated in Brooks, supra, that in extreme cases a failure to object to questions which were violative of a constitutional right did not in all events have to be objected to before they would receive consideration by this Court. The appellant in this case was being tried for murder. The evidence of defendant's guilt was extremely close. A shred of evidence one way or the other could have been persuasive to the jury. In our opinion this warrants our consideration of the questions and responses to which repeated objections were made and sustained by the court, as well as the consideration of the testimony of Donald Ray Boyd wherein he was asked whether he had been in jail or not though no formal objection was made thereto. These questions were prejudicial, requiring prejudicial answers, and being repeatedly pressed upon the jury, deprived the defendant of due process of law, necessitating a reversal of the case.
The remaining assignments of error have received our consideration and are found to be without merit.
The case is reversed and remanded to the docket of the Circuit Court of the Second Judicial District of Jasper County for retrial upon a charge of manslaughter [Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119 (1957); Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970)], and in the event of a verdict of guilty, for the imposition *201 of a sentence not to exceed twelve years. [People v. Henderson, 60 Cal.2d 482, 35 Cal. Rptr. 77, 386 P.2d 677 (1963); North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); Levine v. Peyton, 444 F.2d 525 (4th C.A. 1971)].
Reversed and remanded.
GILLESPIE, C.J., and SMITH, ROBERTSON and SUGG, JJ., concur.