**James A. GUNNING, Petitioner,**

v.

**Gene T. COUSIN, and the State of North Carolina, and the North Carolina Department of Correction, Respondents.**

**No. C–C–75–18.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 29, 1978.

Joseph W. Grier, III, Charlotte, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., Dept. of Justice, Raleigh, N. C., for respondents.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

James A. Gunning, petitioner, was convicted by a jury in Gaston County, North Carolina, Superior Court on March 7, 1974, of felonious breaking and entering and felonious larceny. He was sentenced to ten years of imprisonment for breaking and entering, and five years' imprisonment for larceny, the terms to be served concurrently.

Gunning in this habeas corpus petition seeks a new trial based upon the failure of the prosecution to disclose an understanding that had been reached with the chief prosecution witness and upon false testimony by that prosecution witness in which he denied the existence of such an understanding, thereby preventing effective impeachment.

### FINDINGS OF FACT

1. The charges against petitioner arose out of the theft of four television sets from Brookshire's Television and Radio Sales and Service in Belmont, North Carolina, on December 28, 1973. After the break-in, police arrested four persons—petitioner, Melvin Eskew, Randy Fraley and Marvin Massey. The four men had been stopped by police in

a neighboring town a few miles from the television store shortly after the break-in occurred. They were riding in a car which fit the descriptions given to police by two persons who witnessed the break-in. Neither witness was able to describe or identify anyone involved in the break-in, but one witness had told police that she had seen four men enter the store and leave together in a car.

2. The thieves had gained entrance into the television store by tossing a cement block through a glass door. A series of similar break-ins had led police to refer to the thieves as the "Cement Block Gang." At the time petitioner and the other three men were stopped by police they had none of the stolen television sets with them. A search of the car turned up one cement block and a UHF television antenna, which was never reported as one of the stolen items.

3. Police testified that immediately after his arrest Melvin Eskew made an *oral* statement confessing the crime and implicating petitioner and the other two men arrested. No *written* statement was ever made by Eskew.

4. Eskew subsequently retained an attorney, James Gray, of the Gaston County Bar. Gray advised him that he was in jeopardy because of his statement and that he should not try to change his story. Gray proposed to Eskew that he approach the district attorney and try to make a deal. Gray thereafter talked with Captain Homesley of the Gaston Rural Police and proposed that Eskew be used as a prosecution witness against the other men arrested. Together, Gray and Homesley approached William L. Morris, the assistant district attorney assigned to petitioner's case, and made the same offer. Morris told Gray that Eskew's testimony would be taken into account in determining what action the prosecution would take against Eskew. Gray then advised Eskew that he should testify truthfully at the trials of the other men and that he would be better off if he did so testify. In this habeas corpus proceedings Gray testified that in such cases it was not customary to reduce such undertakings to writings nor to be too specific about them, but that the practice was to rely upon the "good faith" of the prosecuting attorney.

5. On January 18, 1974, preliminary hearings were conducted in district court in the prosecutions of the petitioner Gunning, of the co-defendant Fraley, of the co-defendant Massey and of the co-defendant Eskew. Pursuant to the arrangement between Eskew and the prosecutor, Eskew testified on behalf of the prosecution. Probable cause on the felony charges was found against petitioner Gunning and against Fraley and Massey, and their cases were scheduled for trial in the Superior Court later on. On the same day, however, January 18, 1974, Eskew's own case was ordered postponed indefinitely. The prosecution at the January 18, 1974 hearing was conducted by Berlin Carpenter, then an assistant district attorney but now a district court judge. Mr. Carpenter wrote a note upon the jacket or "shuck" of the warrant charging Eskew with a felony a notation in his *handwriting* reading as follows:

"Cont. Indefinitely. B.H.C.

"After Cases of
State v. Marvin Massey
" v. James Gunning
" v. Randy B. Fraley
disposed of in
Sup. Ct.
put back on for
Misd. Plea in
Dist. Ct.
B. H. C." (Emphasis added.)

The notation, according to Judge Carpenter, signified an understanding or agreement between the district attorney's office and the plaintiff and his counsel that if Eskew testified in the Superior Court to the satisfaction of the prosecution, Eskew would not be tried in *Superior* Court on a *felony* charge but would be tried in the *district* court on a *misdemeanor* charge. Such agreements and such notations on files were customary, and such notations were ordinarily not made without some prior agreement or understanding.

6. Petitioner Gunning was tried in Superior Court on the felony charges beginning on March 6, 1974. Melvin Eskew was the chief witness for the prosecution and gave the only evidence linking petitioner Gunning to the crime. William L. Morris was the prosecuting attorney. On cross-examination (T. 75) the following questions and answers were put:

"Q. All right, tell what was promised to you for testifying for the state by your lawyer?

"A. I haven't had nothing promised to me.

"Q. Nothing promised you?

"A. They didn't promise me anything.

\* \* \* \* \* \*

"Q. All right, was anything promised to you by your lawyer if you testified?

"A. No, he said that since I had written out, you know—he said, you know, we had done it, there wasn't no use to change, you know. He told me to go ahead and testify. You know, we had already—me and Fraley had already anyhow—and Massey—that we had done it, you know."

Counsel for Gunning attempted to cross-examine the witness about his statement denying that he had been promised anything as follows:

"Q. So, this is your warrant and your charge, isn't it?

"A. (The witness nods his head in the affirmative.)

"Q. Have you seen what is written on your jacket here?

"A. No, sir.

"THE DISTRICT ATTORNEY: OBJECTION.

"THE COURT: OBJECTION SUSTAINED.

"Q. You have never seen that?

"A. I haven't looked at that. It's my first time seeing it.

"Q. Does it refresh your recollection—

"THE COURT: Don't ask him what was on that jacket. He said he has never seen it.

"Q. That is your jacket though, isn't it?

"A. I don't know.

"Q. And you have never been before a jury to answer for it, have you?

"A. Answer for what?

"Q. Answer for the crime that you committed?

"A. No, sir."

The record does not show that the prosecution volunteered any information to Gunning or his counsel as to the details of an understanding between the prosecution and the principal witness, Eskew.

7. Other than the cross-examination above-quoted petitioner's counsel did not appear to pursue the subject of the notation on the Eskew case file; and he did not attempt to offer direct proof of Mr. Carpenter's writing on the file. Otherwise he did conduct a vigorous examination of Eskew, attempting to attack his credibility on various points. After petitioner was tried and convicted, the prosecution witness Melvin Eskew went into military service. A year and a half later, on August 7, 1975, his case was removed from the inactive files and a *nolle prosse* with leave to reopen was taken by then assistant district attorney Berlin Carpenter, author of the January 18, 1974 notation. He added another note to the case file as follows:

"Def testified for State in Sup. Ct. Now in service & has been for 1 yr. BHC"

On November 6, 1975, without further recorded explanation, the district attorney took a voluntary dismissal of Eskew's prosecution.

The price for Eskew's testimony was thereby paid.

8. There was evidence of broken bits of glass in Gunning's shoes, but no evidence that it came from the building which had been robbed. There was testimony by a police officer that Eskew had incriminated Gunning in an oral statement shortly after his arrest, but that statement, never reduced to writing, was corroborative only. Eskew was in the car when the four men were arrested; the arrest occurred several miles and a considerable time after the break-in. The testimony of Eskew there-

fore was the only evidence directly linking petitioner to the crime itself.

## CONCLUSIONS OF LAW

1. A clear understanding existed between prosecution and the witness Eskew that if Eskew testified to the pleasure of the prosecution he would not be tried for a felony and his case would be transferred to misdemeanor court. His denial that any promise had been made to him might be semantically accurate but was substantively false. The prosecution knew the situation but objected to cross-examination about it; and the court sustained the objection. Knowing use by the prosecution of materially false testimony violates a defendant's right to a fair trial. This is true whether the evidence is solicited by the prosecutor or is simply allowed to stand uncorrected when it appears. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

2. Where there exists an understanding or agreement that in exchange for a witness' testimony he will receive immunity from prosecution, *or other favorable consideration from the State in connection with his own criminal activity,* such agreement must be disclosed to the court and jury if the witness' credibility is an important issue in the case. If there is any reasonable likelihood that the witness' denial of such an agreement or understanding could have affected the jury's judgment as to his credibility, then the agreement or understanding is material and must be disclosed. *Giglio, supra,* 405 U.S. at 154, 92 S.Ct. 763.

3. The fact that the agreement or understanding in exchange for testimony was not made with the district attorney who actually prosecutes the case is not controlling. The district attorney's office is a single entity, and any agreement made with one member of the district attorney's staff is an agreement with the State. *Giglio, supra* at 154, 92 S.Ct. 763.

4. There was little to connect petitioner to the break-in at the television store other than the testimony of his alleged confederate Melvin Eskew. Eskew was allowed to deny the existence of any understanding regarding his testimony, even though an understanding did exist, and his testimony stood uncorrected. The existence of such an understanding was material to the issue of Eskew's credibility, and the failure to disclose the agreement to the court and jury deprived petitioner of a fair trial.

5. Defendant did not waive the error. His trial counsel attempted to cross-examine Eskew about the "understanding," and the prosecution, knowing of the understanding, objected to cross-examination and the court sustained the objection. On these facts, even if there is constitutional validity to the *notion of waiver,* the inability of counsel to bring out the existence of the understanding should not be held as a waiver of the right to assert the error here.

6. In accord with the foregoing findings of fact and conclusions of law, a writ of habeas corpus shall issue.

7. Petitioner is directed to tender an appropriate writ.