Jimmy VOYLES, Petitioner,

v.

John C. WATKINS, Commissioner, Mississippi Department of Corrections; Steve Hargett, Warden, Mississippi State Penitentiary; Johnny Price, Sheriff of Lee County, Mississippi; T. B. Bruce, State Executioner; and the State of Mississippi, Respondents,

and

William A. Allain, Attorney General of the State of Mississippi, Additional Respondent.

No. GC 79–115–K–P.

United States District Court,
N. D. Mississippi,
Greenville Division.

May 13, 1980.

Timothy N. Black, Washington, D. C., George Q. Evans and David W. Clark, Jackson, Miss., for petitioner.

Marvin L. White, Jr., Asst. Atty. Gen., Jackson, Miss., for respondents.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this habeas corpus proceeding, Jimmy Voyles, petitioner, attacks the constitutionality of his June 1977 conviction in the Circuit Court of Lee County, Mississippi, of the crime of capital murder and imposition of the death sentence. 28 U.S.C. § 2254. The conviction and sentence were affirmed September 20, 1978, by the Supreme Court of Mississippi. *Voyles v. State*, 362 So.2d 1236 (Miss.1978). On May 14, 1979, the Supreme Court of the United States denied his petition for writ of certiorari. Petitioner thereupon filed in the state supreme court an application for leave to file a petition for writ of error corum nobis and/or

habeas corpus, which was denied July 18. After exhaustion of post-conviction remedies, this court assumed jurisdiction of the habeas petition and stayed execution July 20.

On August 8, the cause was assigned to the United States Magistrate for report and recommendation, including a statement of what issues, if any, required an evidentiary hearing. The magistrate submitted his report and recommendation on October 29, recommending that the writ issue, or, alternatively that the death sentence be vacated for resentencing. The magistrate also recommended that because of the nature of the case, an evidentiary hearing be held on the issues of alleged prosecutorial misconduct and ineffective assistance of counsel. The magistrate concluded his report by recommending that the remainder of petitioner's claims be denied. Timely objections to the magistrate's report were filed by petitioner as well as respondents. Reserving ruling on the magistrate's recommendation that habeas relief be granted, the court on January 16, 1980, conducted an evidentiary hearing on the issues suggested by the magistrate. At this hearing both sides offered oral and documentary evidence. Post-trial briefs having been submitted, the case is now ready for disposition on the merits upon the full record in the state court trial and appeal as well as upon the transcript of the supplemental hearing in this federal district court. As required by Rule 52(a), F.R.Civ.P., findings of fact and conclusions of law are incorporated herein as follows:

## I. FINDINGS OF FACT

(a) *Background Evidence at Trial.*

As established by evidence, independent of the testimony of Hoyt Mayo, Bernice Griggs, 41 years of age, disappeared on March 12, 1976. She resided with her daughter, Glenda Phillips, near Amory, Mississippi, and had been dating petitioner, age 30, for about two months. Four months later, on July 13 or 14, 1976, Mrs. Griggs' body was found in Bucy Bottom Creek about a mile south of the creek bridge. On the day of her disappearance, the victim

was last seen leaving her home about 5 p. m. with petitioner and his 18 year old nephew, Hoyt Mayo. Glenda was told they were going to visit her sister who was in a training school. They left riding in a brown Chevrolet Malibu automobile which Mrs. Griggs had purchased earlier that day at Columbus. On Sunday, March 14, petitioner and Mayo saw Glenda Phillips at her home, and petitioner told her that her mother had gone to Texas. Two weeks later, petitioner again saw Glenda Phillips at her home. On this occasion he told her that he was keeping the Malibu at Mrs. Griggs' request and he had received a letter from her which he would bring on his next trip. On June 8, petitioner attempted to sell the Malibu to a Tupelo car dealer for $2,300 after advising he had secured the car for his wife from a relative in Memphis. At or about this time, petitioner was contacted by a representative of the finance company holding past due notes on the Malibu; petitioner advised him that Mrs. Griggs was in Texas and he would get in touch with her about returning the car to Mississippi. Subsequently, petitioner told the same agent he would go to Texas and return the car for $150. Petitioner did not indicate to the finance company agent that he already had possession of the vehicle.

Mayo, chief prosecution witness, testified that petitioner told him that he was going to "Bucy Bottom to whip this woman," and that petitioner drove him and Mrs. Griggs to a bridge over Bucy Bottom Creek where petitioner had her get out of the car and he began beating her with his fists until she became unconscious. According to Mayo, petitioner got back in the automobile, drove it twice over Mrs. Griggs, and then threw her body into the creek. Mayo said that petitioner drove the Malibu about a mile down the road, stopped, took $90 from Griggs' purse, and hid her clothes in the car trunk. After that, Mayo said that they went to a wrestling match and spent the night at a motel. Mayo said petitioner told him that he killed the victim because she would not put the car in his name.

In contrast, petitioner, testifying in his own behalf, stated that Mayo, who had been drinking, ordered him to stop the car at the creek bridge, where Mayo made the victim get out and then beat her with his fists and a small lug wrench. Petitioner said he was fearful of Mayo who told him not to interfere. According to petitioner, Mayo directed him to start the automobile and back up, when he accidentally backed over the victim. Petitioner insisted that it was Mayo who threw the victim's body into the creek and later took money from her purse.

### (b) Evidence at Habeas Hearing.

During October 1976, petitioner and Mayo had both been arrested on false pretense charges and, while in jail on that offense, they were charged with the Griggs' homicide. In a statement given to law enforcement officers, petitioner implicated Mayo in the murder, while Mayo denied having any knowledge of the crime. In November 1976 the grand jury indicted Mayo for murder and petitioner as accessory after the fact. David Sparks, Tupelo attorney serving as part-time public defender, was court-appointed to represent petitioner. Joseph Timmons, also of Tupelo as well as a part-time public defender, was appointed to defend Mayo. Several weeks later, Mayo employed Jimmy Shelton as his attorney; Timmons withdrew from the case and later assisted Sparks with petitioner's defense. Upon Shelton's advice, Mayo gave a statement implicating petitioner in the murder of Mrs. Griggs and he was given a lie detector test. Largely on the basis of Mayo's statement, the prosecuting attorney in February 1977 obtained a new indictment charging petitioner with capital murder, and dismissed the accessory indictment. The murder indictment against Mayo, however, was not nol prossed and remained pending. The district attorney explained that he had not then reached a decision about how to handle the case against Mayo.

Thus, separate murder indictments against petitioner and Mayo were set for the May-June 1977 term, with petitioner's trial set the week before Mayo's. Shelton advised the district attorney that Mayo was willing to testify for the state in petitioner's trial, even though Mayo's testimony would be self-incriminating as an accessory. Shelton believed that Mayo would be given consideration for his becoming a state's witness in event petitioner was convicted. Shelton as well as Mayo, however, stated that no promises or inducements were made by the prosecution or law enforcement officers to secure Mayo's testimony. After petitioner's conviction for capital murder, Mayo's case was continued by agreement until the August term of court. On August 19, Mayo was indicted as an accessory after the fact of petitioner's murder of Mrs. Griggs, and the murder indictment against Mayo was dismissed. On September 16, Mayo entered a guilty plea to the accessory indictment and received a five year sentence, two years of which were suspended on good behavior.

### (c) Was There Prosecutorial Misconduct?

The issue of prosecutorial misconduct relates to whether the prosecution had an agreement or understanding with Mayo to secure his testimony. Petitioner contends that such an understanding existed and the prosecution's failure to disclose it was violative of his due process rights. Lending credence to this claim, David Sparks, petitioner's trial counsel, in an affidavit, stated that Thomas Gardner, the assistant district attorney, told him that in the state's attempt to obtain evidence against Mayo or petitioner "we [the state] held out the 'bait' and Mayo was the one who took it." At the habeas hearing, Sparks affirmed that Gardner made this statement after the evidence was all in and before the return of the jury verdict. Sparks was inclined to believe that this was told him in jest and had no serious meaning. This was the first discussion he had with the prosecutor's office about Mayo's testimony. Timmons, who assisted Sparks at petitioner's trial, stated that he, too, heard Gardner make the statement at the courthouse and did not know what was meant by it. Both attorneys, however, testified they knew of no agreement made by

the prosecution to secure Mayo's testimony, but they expected he would be given consideration at time of sentencing for having been a witness for the state. Shelton, also called as a witness by petitioner, stated that Mayo wanted to testify against petitioner and he did not object since Mayo had already given a statement implicating petitioner in the slaying. Shelton stated that he had no understanding or agreement with the prosecutors for benefits in exchange for Mayo testifying against petitioner. He did assume, however, that Mayo would be given some consideration for testifying for the state; this assumption was based on his extensive experience in criminal practice. Shelton stated that he was in fact preparing for Mayo's trial scheduled for June 15, after petitioner's trial, but sought a continuance because of the publicity generated by petitioner's trial and conviction. Shelton emphatically stated that he had no prior understanding that Mayo would be reindicted as an accessory or would receive a light sentence. Mayo, at the habeas hearing, stated that he decided to testify against petitioner "because it was the right thing to do." He said that Shelton told him it should go easier with him if he were a witness for the state but that he did not have to testify. Mayo maintained that no promises were made to him by the law enforcement officers or the prosecutors, either District Attorney Young, Assistant District Attorney Gardner, or County Attorney Floyd. He claimed he was not influenced by the prosecutors to give testimony although he knew that "good things" might happen to him if he did testify against petitioner and petitioner was convicted. He stated: "I figured I could get out if I testified. What I testified to was the truth."

Gardner testified that he first learned of Mayo's desire to make a statement after Shelton had filed the habeas corpus petition in his behalf. He found Mayo's statement believable although it contradicted an earlier statement denying knowledge of the crime. Gardner stated that nothing was offered to Mayo in exchange for his testimony and he could not recall the reason for

not dismissing the murder indictment against Mayo at the February term of court. He stated Mayo never asked what the prosecutors were going to do for him and that the state's attorneys, at the time of Mayo's sentencing, made no recommendation as to sentence. It is correct that the prosecution made no recommendations for sentence. Gardner had no recollection of telling Sparks and Timmons that "we held out the bait and Mayo was the one who took it," but could not deny making the statement. John Young, district attorney in charge of the prosecution, testified that no promises or understandings were reached with Mayo or Shelton, his attorney, to secure Mayo's testimony. Young stated that upon learning that Mayo was willing to testify, he told him to tell the truth but refrained from making any promises. Young was certain, however, that Shelton expected some consideration to be shown Mayo if petitioner was convicted. Young stated that at the time of petitioner's trial he had still reached no decision as to what disposition would be made of Mayo's case.

The court finds as a fact that Mayo voluntarily became a witness for the state in the hope and expectation that leniency might be shown him, but no agreement, understanding or deal of any sort, either express or implied, was made by the prosecution to secure his testimony. The affirmative testimony of Young, Gardner and Shelton is sufficiently persuasive to refute the circumstantial inference that an agreement must have been reached. Despite the fact that Gardner made a chance remark to defense counsel about Mayo taking the bait, there is no credible evidence to support the notion that the prosecution induced or enticed Mayo to testify by any kind of promises. Instead, Mayo, as well as his attorney, thinking that it was in his own interest to do so, took the initiative on his own. A hope or even an expectation for leniency, where nothing in return was promised by the prosecution, did not amount to an understanding, or throw upon the prosecution a burden of disclosure. In fact, Mayo was never asked at trial what benefit he

expected to receive as a state's witness, and hence made no denial of his expectation, or testified in such manner as to require disclosure. Nor does it appear that defense counsel was in any way misled by the prosecution. The overwhelming weight of the evidence convinces us that no promises or inducements were made to Mayo, and hence there was nothing for the prosecution to disclose on the state of the trial record. The court finds there was no prosecutorial misconduct.

### (d) *Ineffective Assistance of Counsel.*

Detailed evidence on this issue was received at the habeas hearing. Sparks, a University of Mississippi Law School graduate, had five years of practice at the time of petitioner's trial. From November 1975 until June 1977 he served as part-time public defender along with Timmons and was responsible for 10 to 20 felony cases set for trial at each term of court. Petitioner's case was the first capital murder case Sparks had ever tried. Indeed, he had never tried a murder case of any type. He was appointed in November 1976 to represent petitioner who was first indicted as an accessory after the fact, while Mayo was indicted for the murder of Mrs. Griggs. Joseph Timmons, a 1974 University of Mississippi Law School graduate, voluntarily assisted Sparks at petitioner's trial. Timmons was never appointed to the case, and the responsibility for the defense remained with Sparks. Sparks intended to plead petitioner guilty to the accessory charge; before that could be accomplished, petitioner was reindicted for capital murder.

### (e) *Pretrial Efforts.*

Shortly before petitioner's trial, Sparks learned that Mayo would testify for the state. He made no inquiry of the prosecutors or Shelton as to what arrangements, if any, had been made to obtain Mayo's testimony, yet from his experience in criminal cases Sparks knew that testifying for the state would inure to Mayo's benefit. Also, it was evident to Sparks that Mayo's testimony would be crucial, for without it the state had no direct proof that petitioner murdered Griggs. Sparks realized that the success of the defense depended upon the jury's finding petitioner's version of events to be more credible than Mayo's. Sparks as well as Timmons had certain knowledge of Mayo's prior criminal convictions but they made no effort to locate witnesses to attest to Mayo's bad reputation for veracity. On cross-examination at the habeas hearing, Assistant District Attorney Gardner acknowledged that "Mayo's reputation in the community for truth and veracity was not very good." (Tr. 310). There existed a reasonable basis for attempting to impeach Mayo's credibility. Well before trial, petitioner furnished Sparks the names of the Willis brothers, who operated a used car dealership at the Skyline community near Tupelo, as persons who could be of help in defense. The Willises expected to be contacted by petitioner's attorney but never were. Sparks' reason for not contacting the Willises was his belief that they had a poor reputation in the community and would be unhelpful. Had he made contact, Sparks would have learned that Billy Joe Willis could have testified that Mayo had a bad reputation for veracity and through the Willis family he could have secured other witnesses having like opinions. Indeed, the Willis brothers—Leon, Jerry and Billy Joe—had they been requested, were in position to testify as character witnesses for petitioner, whom they had favorably known for a number of years as an employee. They had an established automobile business, were persons without criminal convictions and were regular churchgoers in a family having three ministers, Leon, L. D. and Robert Willis. At the habeas hearing they gave impressive, unimpeached testimony. Beside the Willis brothers, five other residents in the Skyline community appeared at the habeas hearing to testify that they had known petitioner for many years and were in position to testify as to his good reputation for veracity and would have been willing to do so at his trial had they been contacted. Sparks made no investigation in the Skyline community seeking character witnesses for petitioner al-

though petitioner grew up and worked there for a number of years. Sparks did talk to Ernestine Martin, petitioner's sister, but did not request her to attend the trial. Consequently, at trial the defense had no witnesses to impeach Mayo's credibility or attest to petitioner's good reputation for truth and veracity.

### (f) *Trial Efforts.*

■ On cross-examination, Sparks questioned Mayo as to his previous criminal convictions, which Mayo denied (Tr. R. 120), yet defense counsel failed to produce records of known criminal convictions for impeachment. While the attorney did elicit from Mayo the bare fact that he had been indicted for the murder of Mrs. Griggs, he failed to ask Mayo to admit, as he testified readily at the habeas hearing, that he expected to receive favorable consideration from the state if the trial resulted in petitioner's conviction.[1] In brief cross-examination, defense counsel also failed to bring out that Mayo had made previous contradictory statements, first denying all knowledge of the crime and then implicating petitioner in the slaying; and they failed to bring out the additional fact that the state had originally indicted Mayo for murder

and petitioner as an accessory, with petitioner being subsequently prosecuted for capital murder only after Mayo indicated a willingness to testify against him. These disclosures relating to Mayo's interest and unreliability would, without doubt, have been highly material to the jury's evaluation of his testimony. Additionally, Sparks failed to request the court to issue the standard jury instruction that uncorroborated testimony of an accomplice should be viewed by the jury with care and caution.[2]

At the guilt stage of trial, petitioner was the only witness for the defense, other than John Brown who testified that on one occasion Mayo had told him the brown Chevrolet Malibu belonged to him. (Tr. R. 153–54).

After deliberation, the jury brought in a verdict that the petitioner was guilty of capital murder. Thereupon, both the state and petitioner elected to stand upon the record made at the guilt stage. Thus, defense counsel offered no evidence in mitigation although they had obtained favorable instructions from the court that the jury might consider in mitigation any circumstances surrounding the life and character of petitioner reasonably relevant to the death penalty or life imprisonment.[3]

---

1. The entire text of Sparks' examination on this point is:

   Q. It is true, is it not, that you are currently under indictment for murder?
   A. Yes, sir.
   Q. You are indicted for the murder of Bernice Griggs?
   A. Yes, sir.
   Q. And you were indicted for that murder last November?
   A. Yes, sir. (Trial Tr. 95)

2. The magistrate recommended that the writ of habeas corpus issue because the court failed to issue the cautionary instruction on accomplice testimony. His view was "nothing could have been more prejudicial than omission of the cautionary instruction on accomplice testimony. As recognized by the Fifth Circuit, a state trial court's failure to give such an instruction in a proper case amounts to denial of a fundamentally fair trial.

   The cautionary instruction was not requested by defense counsel at the trial in State Court. This failure by defense counsel does not relieve the court of its obligation to give a cautionary charge where circumstances require it. We have found such circumstances to exist where the prosecution's hope for a conviction hinges solely on the persuasiveness of the accomplice's testimony where that testimony is shown to be reliable. *McDonald v. Sheriff of Palm Beach County,* 422 F.2d 839, 840 (5 Cir. 1970)." (Rep. and Recom. p. 12).

   We disagree that the court's failure, rather than that of defense counsel, constituted legal error in this case because the trial record does not show that Mayo's testimony was unreliable, a circumstance attributable to the omissions and failures of counsel to render effective representation.

3. Instruction D. 33, Tr.Rec. p. 239:

   The Court instructs the Jury that you may consider as mitigating circumstances evidence of any circumstance or combination of circumstances surrounding the life and character of Jimmy Voyles or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life imprisonment.

Defense counsel did not offer petitioner to testify in mitigation since it was thought that he had not made a good witness at the guilt stage, had not borne up well on cross-examination, and the jury had reacted unfavorably to his testimony. The wisdom of this course, in a death case, is debatable. Nevertheless, petitioner had available, if Sparks had called them, an array of witnesses who were in position to testify that petitioner had a stable employment record, and that he was known to be a hardworking, dependable person with a mild and nonviolent disposition. Petitioner's present counsel produced affidavits of 17 witnesses, many of whom appeared at the habeas hearing, who were in position to offer such mitigating evidence. It should be noted that all of these persons were located by a single telephone call to the Willis brothers. Also, Ernestine Martin could have testified that petitioner was the father of two children and he had made personal sacrifices to aid destitute members of his family. Character evidence of this nature would clearly have been relevant to the jury's determination as to whether the death penalty should be imposed; moreover, it would have provided evidentiary support for the court's instructions that petitioner's character and circumstances in life might properly be considered in mitigation. The lack of any mitigating evidence resulted from the failure of defense counsel to exercise diligence in lo-

cating and presenting witnesses who were in position to establish traits of good character. It is hardly surprising that the jury, in returning a death penalty verdict, found insufficient mitigating circumstances to outweigh the three aggravating circumstances shown by the state's evidence at the guilt stage.[4]

## II. CONCLUSIONS OF LAW

### (a) *No Prosecutorial Misconduct.*

■ Consistent with the foregoing findings, the court holds that there was no prosecutorial misconduct resulting from a failure to disclose on the record that the prosecution had an agreement or understanding with Mayo in exchange for his testimony, and petitioner failed to show his conviction should be set aside on the authority of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *United States v. Crockett*, 534 F.2d 589 (5 Cir. 1976), and *Williams v. Brown*, 609 F.2d 216 (5 Cir. 1980). Mayo testified voluntarily and without any kind of persuasion or promises from the prosecution. That he hoped that his own case might be helped in some way if he testified against petitioner does not amount to an agreement or understanding within the meaning of *Giglio* and its progeny. The decisions relied upon by petitioner, *Campbell v. Reed*, 594 F.2d 4 (4

---

Instruction D. 34, Tr.Rec. p. 240:
 The Court instructs the Jury that you may consider at the penalty stage of this trial any and all evidence of mitigating circumstances surrounding the life and character of Jimmy Voyles, or mitigating circumstances surrounding the commission of the offense, even though such evidence was introduced at the guilt stage and was not re-introduced at the penalty stage of the trial.
Instruction D. 35, Rec. p. 241:
 The Court instructs the Jury that you may consider the Defendant's age, the Defendant's background, the extent of his cooperation with the police, his emotional and psychological state at the time of the crime and any other mitigating circumstances that would be reasonably relevant to the question of whether he should be sentenced to life in prison as opposed to the death penalty.

4. The verdict was as follows:
 "We, the jury, unanimously find that the aggravating circumstances of:

(1) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any *robbery*, rape, arson, burglary, kidnapping, aircraft piracy or the unlawful use or detonation of a bomb or explosive device.
(2) The capital offense was committed for pecuniary gain.
(3) The capital offense was especially heinous, atrocious or cruel.
are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we unanimously find the defendant should suffer death." (Tr. R. p. 255). This finding by the jury was in accordance with Mississippi's death penalty statute, Miss.Code Ann. § 99–19–101 (1972).

Cir. 1979), and *Gunning v. Cousin*, 452 F.Supp. 916 (W.D.N.C.1978), are easily distinguishable on their facts since in those cases there was sufficient evidence to establish that the prosecution had entered into specific deals with key witnesses to secure their testimony.

### (b) *Ineffective Assistance of Counsel.*

■ In the Fifth Circuit, the standard of effective assistance of court-appointed counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." *Herring v. Estelle*, 491 F.2d 125, 127 (5 Cir. 1974), quoting *MacKenna v. Ellis*, 280 F.2d 592, 599 (5 Cir. 1960), *cert. denied* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). This means that an attorney must not only be qualified by training and experience to adequately represent an accused, but he must actually perform services that are reasonably adequate.

■ Furthermore, when the defendant has been convicted of a capital offense, courts must strictly scrutinize counsel's conduct. *Smotherman v. Beto*, 276 F.Supp. 579, 586 (N.D.Tex.1967). As the United States Supreme Court has noted, death differs from other forms of punishment:

> From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 402 (1977) (plurality opinion).

With the foregoing standards in mind, the court examines the facts heretofore found in the light of applicable precedent. Unquestionably Sparks had adequate training and experience to represent petitioner. As much may also be said of Timmons who voluntarily aided Sparks. The crucial inquiry is whether either discharged the obligation to provide reasonably effective representation.

The Fifth Circuit has held that counsel is ineffective "if he fails to investigate sources of evidence which may be helpful to the defense." *Davis v. Alabama*, 596 F.2d 1214, 1217 (5 Cir. 1979), vacated as moot, —— U.S. ——, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980).[5]

■ It is the duty of court-appointed counsel to interview potential witnesses and to make an independent examination of the factual circumstances, pleadings and law involved. *United States v. Johnson*, 612 F.2d 1011 (5 Cir. 1980); *Rummel v. Estelle, supra.*

Counsel may not sit idly by, thinking that investigation would be futile. As the Supreme Court stated in *Powell v. Alabama*, 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158, 165 (1932):

> It is not enough to assume that counsel . . . thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate.

■ The burden is on the petitioner, however, to prove that counsel's failure to investigate was not harmless beyond a reasonable doubt. *Davis, supra,* at 1221.

---

**5.** Although the Supreme Court's vacation technically strips *Davis* of precedential value, *see, e. g., United States v. Sarmiento-Rozo*, 592 F.2d 1318, 1321 (5 Cir. 1979), we nonetheless conclude that it is "the most pertinent statement of the governing law." *See County of Los Angeles v. Davis*, 440 U.S. 625, 646, 99 S.Ct. 1379, 1391, 59 L.Ed.2d 642, 658 (1979) (Powell, J. dissenting). Furthermore, *Davis* is but one of many Fifth Circuit cases holding that defense counsel has a duty to investigate. *See Rummell v. Estelle*, 590 F.2d 103, 104 (5 Cir. 1979); *Mendenhall v. Hopper*, 453 F.Supp. 977, 987 (S.D.Ga.1978), aff'd mem., 591 F.2d 1342 (5 Cir. 1979); *Gaines v. Hopper*, 575 F.2d 1147, 1150 (5 Cir. 1978); *King v. Beto*, 429 F.2d 221, 224 (5 Cir. 1970), *cert. denied*, 401 U.S. 936, 91 S.Ct. 921, 28 L.Ed.2d 216 (1971).

The evidence adduced at the habeas corpus hearing clearly establishes that the lack of investigation was prejudicial. With little effort counsel could have secured credible testimony of several persons that Mayo's reputation for truth and veracity was bad while petitioner's was good. Sparks acknowledged that he made no search for character witnesses although he realized that such evidence was material at the guilt stage. In *MacKenna v. Ellis*, the Fifth Circuit held that "the presence of character witnesses was essential to the defense—once [the accused] took the stand." 280 F.2d at 602. In a case potentially involving the death penalty which is dependent upon belief by a jury of the accused's testimony as opposed to another's, it cannot be fairly concluded that the error was harmless beyond a reasonable doubt.

Moreover, the failure of defense counsel to conduct an adequate cross-examination of Mayo violated petitioner's right to due process. The right to cross-examine witnesses is guaranteed by the sixth amendment right of confrontation. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353. Furthermore, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* It is apparent that Sparks had available the means to effectively impeach Mayo's testimony by several methods, yet none was resorted to. By vigorous cross-examination, Mayo could have been attacked for bias and interest in the outcome of petitioner's trial due to his expectation of lenient treatment by the prosecution. A second way would have been to show that Mayo had made previous contradictory statements to law officers in which he denied all knowledge of the crime. A third method would have been to introduce evidence of Mayo's prior criminal convictions. Finally, counsel could have impeached Mayo by adducing testimony from witnesses that he was unworthy of belief. However, defense counsel completely failed to use any of these well-known methods to assail Mayo's testimony in the eyes of the jury.[6] Under the circumstances of this case, we cannot conclude that these errors of counsel were harmless beyond a reasonable doubt.

We find inexcusable the failure of counsel, who knew the critical importance of Mayo to the prosecution's case, to request an instruction that his testimony as an alleged accomplice should be viewed with caution and suspicion. "Accomplice testimony should always be scrutinized carefully by the jury because of its inherent untruthworthiness. This is especially true when the witness has manifested his unreliability by making previous conflicting statements concerning his knowledge of the crime" *Tillery v. United States*, 411 F.2d 644, 646–47 (5 Cir. 1969), or when "the prosecution's hope for a conviction hinges solely on the persuasiveness of the accomplice's testimony." *McDonald v. Sheriff of Palm Beach County*, 422 F.2d 839, 840 (5 Cir. 1970). Mayo's testimony constituted the only direct evidence that petitioner committed the murder. "If his testimony is disregarded, there is simply no case." *See Williamson v. United States*, 332 F.2d 123, 127 (5 Cir. 1964).

Before finding that this failure warrants habeas relief, however, we must find "cause" for the failure and "prejudice" resulting from it. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

---

**6.** The Supreme Court of Mississippi has repeatedly held that the impeachment of a witness may be accomplished "in four modes, and in four only:

. . . . (1) By cross-examination; (2) by proving his previous contradictory statements or acts; (3) by proof of his conviction of a criminal offense; and (4) by adducing general evidence tending to show that he is unworthy of belief on his oath. And some authorities add a fifth: By physical demonstration or experiment properly conducted . . . .."

*Wood v. State*, 257 So.2d 193, 199 (Miss.1972); *Manning v. State*, 195 So. 319, 320 (Miss.1940).

Ineffectiveness of counsel constitutes cause within the meaning of *Wainwright. See Jurek v. Estelle*, 593 F.2d 672, 683 (5 Cir.), *reh. en banc granted*, 597 F.2d 590 (1979); *Sincox v. United States*, 571 F.2d 876, 879–80 (5 Cir. 1978). We find that counsel's failure to request the instruction amounts to "an abdication of [counsel's] duty to make informed tactical choices at trial." See *Jurek, supra.* As to prejudice, the Fifth Circuit has noted that in close cases, the cautionary instruction "may turn the scale." *Tillery, supra* (quoting L. Hand in *United States v. Becker*, 62 F.2d 1007, 1009 (2 Cir. 1933). Unquestionably, this was a close case. In order to convict petitioner, the jury had to accept as credible Mayo's testimony. We conclude that, given the indispensable need for the instruction, prejudice resulted from counsel's failure to request it.[7]

■■■ The foregoing is sufficient to convince the court that the court-appointed attorney failed to provide effective assistance of counsel at the guilt stage of the proceedings, that his failure constituted a violation of petitioner's sixth amendment rights, and as a consequence a new trial must be granted. As an alternative ground for our holding, however, we consider counsel's representation at the sentencing stage. We note initially that "sentencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel." *Gardner, supra*, 430 U.S. at 358, 97 S.Ct. at 1205, 51 L.Ed.2d at 402. Effective assistance at this stage, as at other stages, requires zealous, and not merely perfunctory or pro forma representation. As stated, petitioner's trial counsel failed to present any evidence of mitigating circumstances, although an array of witnesses to testify in mitigation would have been readily available upon proper investigation. An appeal to spare the petitioner's life could have been force-

fully made through diligent efforts of his trial counsel. Instead, the entire defense at sentencing consisted of the following "argument" by counsel:

> The defendant also submits the portion of the trial to you on the record as you now have it. The last instruction that the Court read has various circumstances in it called aggravating and mitigating. It is up to you to take all those, apply them to what you have heard, the testimony that is now in the record and to find whether any of those apply. I suppose the bottom line of this is you have to decide whether the imposition of the penalty of death upon Jimmy Voyles will benefit our society and serve the ends of justice. I think it will not. Thank you. (Tr. 57–59).

We are thus faced with a situation where the defense attorney "put on what amounted to no defense at all," thereby making any showing of prejudice unnecessary. See *Davis v. Alabama, supra*, at 1221–22. However, we unhesitatingly believe that this lack of defense, at such a critical stage, due to ineffectiveness of counsel, resulted in great prejudice to petitioner. As the Fifth Circuit has noted, court-appointed counsel "cannot stand still and do nothing. That indeed might be the best evidence of incompetency, or infidelity, or ineffectiveness, or all three." *Williams v. Beto*, 354 F.2d 698, 706 (5 Cir. 1965). Here, trial counsel, for all practical purposes, did "stand still and do nothing" at sentencing. This amounts to a clear violation of petitioner's constitutional rights to effective assistance of counsel and due process.

## CONCLUSION

■■■ We therefore conclude that because of ineffective assistance of counsel at both the guilt and sentencing stages of his trial, petitioner is entitled to relief upon his petition for habeas corpus. This renders it unnecessary for the court to pass upon oth-

---

7. Since the Mississippi Supreme Court has indicated that in capital cases it "give[s] careful scrutiny to the proceedings in the trial below in order to determine whether accused received a fair trial and without necessary regard to whether technical basis for preserving error was made by counsel," *Irving v. State*, 361 So.2d 1360, 1363 (Miss.1978), the *Wainwright* requirements may be inapplicable. See *Gardner v. Florida, supra* (*Wainwright* standards inapplicable since, inter alia, state recognizes its duty to consider the total record).

er errors of law asserted by petitioner, either at trial or on appeal. We approve that portion of the magistrate's report upholding the constitutionality of Mississippi's death penalty statutes, Miss.Code §§ 99–19–101, –103, and –105 upon the authority of *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Spinkellink v. Wainwright,* 578 F.2d 582 (5 Cir. 1979), *cert. denied* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796. We have previously held these decisions to be conclusive upon the constitutionality of Mississippi's death penalty statutes. *Washington v. Watkins,* GC 79–93–K–P, Dec. 19, 1979, unreported (N.D.Miss.) Thus, there is no constitutional bar to the state's invoking valid state statutes in seeking the death penalty upon a retrial of petitioner upon the indictment of capital murder of Bernice Griggs.