266 So.2d 10 (1972)
Leon T. ROGERS, Jr.
v.
STATE of Mississippi.
No. 46691.
Supreme Court of Mississippi.
June 19, 1972.
Rehearing Denied September 12, 1972.
*11 Eaton, Cottrell, Galloway & Lang, Gulfport, for appellant.
A.F. Summer, Atty. Gen., by Guy N. Rogers and G. Garland Lyell, Jr., Asst. Attys. Gen. and John M. Kinard, and Edwin A. Snyder, Special Asst. Attys. Gen., Jackson, for appellee.
PATTERSON, Justice:
This is an appeal from the Second Judicial District of Harrison County wherein Leon T. Rogers, Jr., Paul H. Sanders, Quentin Stringer and Thomas D. Dunn were indicted for obtaining money of the State of Mississippi in violation of Mississippi Code 1942 Annotated section 2149 (1956), commonly called the "false pretense" statute. Upon motion Rogers was granted a severance for trial and after a prolonged hearing, was found guilty by the jury. He was sentenced to serve one year in the county jail and fined $30,000 and costs, with the jail term being suspended upon future good behavior and upon payment of the fine and costs. From this verdict and judgment Rogers appeals. We affirm.
Leon T. Rogers, Jr., a resident of Jackson, is an intelligent and successful realtor who deals in the purchase, sale and development of property throughout the state. In 1965 he was notified that certain lands in the Second Judicial District of Harrison County, owned by the Redding estate, might be available for purchase. At the time tentative plans of the Mississippi Highway Department indicated that Interstate 10 would traverse a portion of the Redding property. Rogers expressed an interest in the property and contacted Captain Enoch Niblack, the representative of the Redding estate, to negotiate for its purchase.
A Gulfport law firm was retained by Rogers to aid in acquiring the property with two young attorneys associated in the firm, Joseph Meadows and Donnie Riley, being directly involved in the negotiations. An agreement of purchase was reached in the spring of 1966 for the 110-acre tract at $1200 per acre. Title was passed by several deeds in June and July 1966 into the name of Joseph Meadows, defendant's attorney, and on July 15, 1966, Meadows conveyed to the defendant. The record does not reveal the exact cost of the purchase to the appellant. Rogers estimated his investment in the land to be between $170,000 and $175,000. This figure reflects extra expenditures necessary to the purchase which Rogers testified he paid above the agreed per-acre price.
At the time of the purchase Rogers maintained a close business relationship with Paul Sanders, a co-indictee, and real estate developer. In the past Rogers had financed the purchase of land to be developed by Sanders who would receive 45% of any profits which might ensue from *12 future sales. There is testimony which suggests that a similar method of operation was to be followed with the lands here involved.
The transactions following the purchase of the Redding property by the appellant are complicated and do not lend themselves to concise statement. For brevity, we do not restate the unrelated and unimportant explanations of some of the witnesses to the various transactions, but attempt only to distill the record into an accurate statement of the substantive facts as we discern them.
On the day of the acquisition of the Redding property by Rogers, either he or Sanders contacted Attorney Joseph Meadows by phone in Harrison County and requested that two deeds be drawn for the signature of Rogers. The description of the properties to be conveyed was dictated over the phone to the secretary of Meadows. One of these deeds conveyed a lot on the former Redding property 120 x 220 feet to Joseph Meadows for a recited consideration of $9500 and the other conveyed a similar lot to Donnie Riley for a recited consideration of $7500. These deeds were prepared by Meadows in his office in Harrison County and forwarded to Rogers in his Jackson office for signature.
On July 15, 1966, the very date he acquired title to the Redding land, these deeds were executed by Rogers. On October 19, 1966, they were filed for record on the public rolls of the First Judicial District of Harrison County. It is without dispute that these two deeds, bearing revenue stamps initialled by Rogers, in an amount commensurate with the recited consideration, were in fact not bona fide transactions since no consideration was paid for either of them nor was title intended to be conveyed thereby. The grantees of the lots upon learning that the deeds had been filed for record promptly quitclaimed to Rogers.
Rogers denied that he called Meadows requesting the preparation of the deeds and argues that since Sanders did not testify, the record reveals as an absolute that he, Rogers, made no such call. He explained his execution of the deeds by testifying that Sanders was handling all development of the Redding property and that he was only remotely involved in this aspect of the business and therefore, when Sanders presented the deeds to him indicating they were part of a proposed apartment complex being developed by Riley and Meadows, he executed them without investigation. The attorneys, the grantees in the deeds, testified that while they discussed an apartment project in another area of the county, they had never proposed to either Rogers or Sanders that such development be constructed on the Redding property or that they urged them to participate in any such project.
Quentin Stringer, the Chief of the Right-of-Way Division of the Mississippi Highway Department, co-indictee, had the responsibility of assigning appaisers to determine the value of property to be purchased for the construction of Interstate 10. On May 3, 1966, the acquisition of property for the proposed highway was formally authorized and Stringer assigned Thomas Dunn, a staff appraiser for the highway department, and O.H. Burns, an independent appraiser of Gulfport, to make an appraisal of the former Redding property needed for highway purposes.
Thereafter, Burns went upon the tract with Dunn and while on the property, Dunn, a co-indictee, disclosed the sale of the two lots by Rogers to Meadows and Riley and indicated they should be used as comparatives in appraising the value of the right-of-way to be acquired by the State. Burns later learned in discussing the matter with Meadows that the sales were not bona fide transactions, were without consideration, with the result he did not use them in his appraisal of the property. In the course of conducting his appraisal, however, Burns contacted Rogers to ascertain the purchase price of the property. Burns testified that he was advised by Rogers that he had *13 $256,000 invested in the property. Counsel for the appellant and the State debate the degree of impact this figure had upon the appraisal of Burns. Regardless of the degree of impact the figure appears several times in the appraisal report prepared for use by the highway department. It reflects a value of $165,000 for the 35.21 acres to be acquired by the highway department out of the 110 acres formerly belonging to the Redding estate.
The second appraisal was made by Dunn, an employee of the highway department, with offices in Jackson, and who also engaged himself in appraisal work for Rogers and Sanders on a parttime basis. He appraised the property for $181,700 and his report reflected the false deeds to Riley and Meadows under the section entitled "Property Transaction during the Last Five Years to Date." His appraisal report states these sales were verified and valid. The consideration stated in them was directly related to his appraisal value of $181,700.
Significantly this appraisal also included a plat which contained several fictitious lots. The land purchased included a platted portion called Redding Ridge Addition, as well as some unplatted acreage. Basil Browning, an employee of the Right-of-Way Division of the State Highway Department was requested by Sanders, the business associate of Rogers, both of whom were frequest visitors to the office of the department, to draw in some additional lots on the unplatted acreage on the map for the highway department's files. Browning was reluctant to make this addition, but on the assurance of Dunn that Stringer had authorized their inclusion, the nonexistent lots were included in the plat, thus falsifying it. The drawing was then delivered to either Dunn or Sanders. The inclusion of the lots portrayed the property to be acquired for the right-of-way, or the property adjacent to it, to be developed to a greater extent, and hence more valuable, than it actually was. This plat was an integral part of Dunn's appraisal which was submitted to the highway department on November 2, 1966.
In January 1967 Rogers was contacted by Earl Goodwin, the Chief Negotiator with the Right-of-Way Division of the highway department, for the purchase of the right-of-way. A question arose concerning the title to the land acquired from the Reddings since it had been inadvertently conveyed to Leon T. Rogers rather than to his son, Leon T. Rogers, Jr., the appellant. However, once this impediment was removed by a quitclaim deed of January 11, 1967, recorded in the Chancery Clerk's office of Harrison County on January 17, 1967, bargaining was renewed.
Goodwin testified that the negotiations were pressed for conclusion by Stringer. A preliminary offer of the department was rejected by Rogers. Goodwin was then advised by Stringer, the Chief of the Right-of-Way Division, and his superior, that he should offer $174,000 for the property since it was a figure about midway between the appraisals of Dunn and Burns. The offer was made by Goodwin to Rogers who agreed to accept the sum of $174,000 for the right-of-way. The figure was approved by Goodwin on January 17, 1967, and thereafter on January 23, 1967, Rogers conveyed the 35.21 acres to the State of Mississippi for right-of-way. Goodwin then authorized the issuance of two checks, one for $16,431.85, and another for $157,376.75[1] and directed by writing on the invoices that the checks should be delivered to him. The instructions relating to delivery of the checks were not followed, evidently due to an alteration of the instructions, and the checks, signed by the State Auditor on January 24, 1967, were delivered to Rogers on that date and deposited to his account on January 27, 1967. Though perhaps unimportant, the record is in dispute *14 as to the delivery of the checks to Rogers. There is testimony that they were delivered by the secretary of Goodwin to Rogers at one of his places of business, an automobile agency, and that he displayed the checks to his general manager stating that they were from the sale of land on the coast. The secretary denied that she delivered the checks to Rogers since she did not recall doing so. In either event he received the State's checks.
The record reveals that throughout the negotiation and payment stages for the right-of-way the normal procedures of the highway department were not followed. It is apparent that Stringer influenced the proceedings in order to accelerate their completion. The State contends that this departure from normal procedures was influenced by a pending change in the Interstate 10/ Highway 67 Interchange which was initially to have been located on the property acquired by Rogers.
Sometime during the fall of 1966 the highway department was giving consideration to an alternative location for the interchange although approval had been previously given to the right-of-way division for acquisition of property at the initial location. The primary reason for considering an alternative location was to remove the interchange into an area of less commercial or residential development so as to facilitate the movement of traffic to and from the Biloxi peninsula through controlled access facilities. Information reflecting upon the feasibility of acquiring an alternative location for the interchange was assimilated and a decision was made on either January 25 or 26, 1967, during a meeting of the Roadside Development Conference to move the interchange 4/10ths of a mile east of the initial location. Following the approval of the alternative location, Stringer was advised to stay the acquisition of the right-of-way in the vicinity of these two interchanges. This communique was made subsequent to the purchase of the Rogers property by the State on January 23, 1967. It is noteworthy, we think, that Stringer did not at the time acknowledge the previous purchase of the right-of-way.
Following payment by the State for the property, Rogers executed a series of checks. On February 9, 1967, Sanders received a check from Rogers for $1045 and on April 4, 1967, a check for $1770. These checks were explained by their author as being payment for previous appraisal work. During this interval Rogers also withdrew cash from his account, $1200 on January 24, $2500 on January 30 and $1500 on February 10, a total of $5200. These withdrawals were explained as being transfers of funds from one account to another though no testimony of the existence of the "other account" was introduced. Dunn received $1590, according to Rogers, for appraisals in which he participated beginning in May 1967 and concluding in October of that year. There is testimony by Rogers that Dunn was paid fees for similar work in 1965 and 1966, but that the records of these payments were either "filed at our farm somewhere, or in my mother's basement," and as such were not offered into evidence.
The appellant received the 110-acre tract of land by deed of July 15, 1966. He gave testimony that his investment therein was between $170,000 and $175,000. On January 23, 1967, approximately six months later, he executed a deed to the State of Mississippi for 35.21 acres for $174,000 (round figures).
The sale of the right-of-way was questioned by the Federal Highway Administration which was expected by the State to share in the purchase of the property for Interstate 10. After investigation, it suspended federal participation and payment. In fact, the testimony offered by the State by an independent appraiser and an appraiser with the Federal Highway Administration placed the value of the 35.21 acres at $85,420 and $72,565 respectively as of November 1966.
*15 As mentioned, Rogers, Sanders, Stringer and Dunn were indicted during the February term of 1970 by the Grand Jury of the Second Judicial District of Harrison County of the crime of false pretenses. The indictment states in part that the defendants did:
... [w]ilfully, unlawfully, feloniously and fraudulently and designedly conspire together and enter into a felonious common design by virtue of certain false pretenses which they knew to be false and hereinafter set forth, their certain false tokens in writing which they knew to be false, and certain false misrepresentations which they knew to be false, all of which acts were feloniously performed between July 15, 1966 and January 26, 1967, and by virtue of their common design and felonious acts as committed by each of them as hereinafter shown, did wilfully, unlawfully, and feloniously by virtue of said false pretenses cheat and defraud the State of Mississippi of the sum of $174,000.00, in good and lawful money of the United States of America, or a substantial portion thereof... .
The defendants initially filed demurrers to the indictment upon the grounds that it failed to recite that the grand jurors were drawn from the Second Judicial District of Harrison County and that the indictment did not charge an offense against the State since it did not properly recite that the pretenses charged were the moving cause of payment by the State.
The first ground of demurrer was cured by amendment so that the indictment stated the grand jurors were drawn from the Second Judicial District of Harrison County. The lower court held in abeyance a motion challenging the jurisdiction of the court, it being the court's opinion it was not necessary to be ruled upon in view of its conclusion that the second ground of demurrer was well taken in that the indictment did not charge an offense against the State of Mississippi for the reason it did not properly or sufficiently state that the false pretenses charged therein were the moving cause of payment of any monies by the State. The later issue was decided by an opinion of this Court upholding the validity of the indictment and remanding the cause to the trial court. State v. Rogers, Sanders, Stringer and Dunn, 241 So.2d 346 (Miss. 1970). Upon remand a prolonged trial ensued resulting in the defendant's conviction. Hence this appeal.
The first assignment urged for reversal is that the lower court erred in not sustaining the defendant's motion to quash for lack of jurisdiction of the cause in the Second Judicial District of Harrison County. This motion was renewed at the conclusion of the State's case and again when both sides had rested. By Chapter 257, Laws of 1962, an enabling act was passed by the legislature by which Harrison County was subject to being divided into two judicial districts and it was thereafter so divided. Simultaneously, with the passage of this legislation, there was also enacted Mississippi Code 1942 Annotated section 2910-16 (Supp. 1971), which provides:
All crimes and misdemeanors heretofore or hereafter committed or charged to have been committed, after the passage of this act, shall be cognizable only in the proper court of the district in which the offense may be committed, and such court shall have jurisdiction of the same.
The acts for which the defendant was indicted were alleged to have occurred between July 15, 1966, and January 26, 1967, which was subsequent to the creation of the Second Judicial District of Harrison County.
The contention is projected that none of the essential elements of the crime of obtaining money by false pretenses occurred in the Second Judicial District. In fact, it is contended that the crime charged in the indictment if it in fact occurred, took place in the First Judicial District of Hinds County since all false tokens, as well as the payment of the State's money in reliance thereon, transpired in the last-mentioned *16 county. By Mississippi Code 1942 Annotated section 2419 (1956), jurisdiction in criminal cases is usually vested in the county in which the offense is committed. It provides:
The local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed. But, if on the trial the evidence make it doubtful in which of several counties, or judicial districts, or justice of the peace districts, in cases before justice of the peace, including that in which the indictment, or affidavit, alleges it, the offense was committed, such doubt shall not avail to procure the acquittal of the defendant.
The general rule in a false pretense case is undoubtedly that venue jurisdiction lies only in the county or judicial district where the money or other thing of value is wrongfully obtained. This rule is stated in 32 Am.Jur.2d, False Pretenses, section 55 at 209-10 (1967) as follows:
Generally speaking, the venue of a prosecution for false pretenses must be laid in the jurisdiction where the offense was consummated by the obtaining of property, even though the inducing pretense was made elsewhere, and even though the consummation, by delivery of the property, was effected through the instrumentality of an innocent agent, without the personal presence of the principal. But where the crime is begun in one county and ended in another, the defendant may, under the statutes of some states, be prosecuted in either county. A statute may, of course, make it possible to prosecute one for false pretenses where only part of the acts involved in the commission of the offense were performed within the state ... (Emphasis added.)
Our legislature as early as 1857 enacted an exception to this general rule. It is now Mississippi Code 1942 Annotated section 2429 (1956), which states:
When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.
The constitutionality of this act was upheld in Aldridge v. State, 232 Miss. 368, 99 So.2d 456 (1958). It is noted inter alia that the jurisdictional issue raised by the appellant is directed to the proposition that the offense charged was committed totally in Hinds County or, if not entirely there, then in a combination of the First Judicial Districts of Harrison County and Hinds County, but in either event none of the elements of the crime charged occurred in the Second Judicial District of Harrison County where the appellant was tried. In approaching this problem we note initially that when two judicial districts are created in a county, the effect is the same for jurisdictional purposes as if they were two counties. Isabel v. State, 101 Miss. 371, 58 So. 1 (1912); Passons v. State, 208 Miss. 545, 45 So.2d 131 (1950). There can be no doubt from the evidence that the defendant could have been tried in Hinds County, the offense having been consummated there.
The critical issue is whether an essential element of the crime occurred in the Second Judicial District of Harrison County. In Addington v. State, 199 Kan. 554, 431 P.2d 532 (1967), the Court discussed the early common law rule which required prosecution of a defendant in the county where the offense was consumated or, if the offense consisted of a series of acts, then in a county where one of the acts was in itself a complete crime. The opinion progresses to the announcement that:
By the time the constitutions of the various states were adopted it became an established rule that the English common law requirement as to venue, as modified by early statutes, was satisfied if the prosecution took place in either county where the offense occurred partly in one *17 county or partly in another, or if the prosecution took place in a county where the overt act or the effect of the overt act occurred. (431 P.2d at 540) (Emphasis added.)
The Court was careful to point out, however, that the mere existence in some county of acts of the accused, lawful in and of themselves, but necessary to be alleged and proven in order to establish the crime as charged, does not invoke jurisdiction so as to permit the trial of a defendant in such county.
The issue before the Court can be briefly stated as follows: The property acquired by Rogers lies in the Second Judicial District of Harrison County. The deeds conveying title into Meadows and subsequently to Rogers, the "false" deeds of Rogers to Meadows and Riley, and the deed of Rogers to the State are all recorded in the First Judicial District of the county. The appraisal of Burns containing the figure of $256,000, related by Rogers to be "his investment," and the appraisal of Dunn containing the reference to the false deeds as valid, were either lodged, or to be lodged, in the highway department's files in Hinds County.
The direction of Stringer to Goodwin to offer a figure between the two appraisals to Rogers occurred in Hinds County. The offer, as well as the State's checks, was also accepted in Hinds County. The critical issue arising therefrom is whether an essential element of the crime occurred in the Second Judicial District of Harrison County so that it had jurisdiction of the cause.
As mentioned, the Second Judicial District was created subsequent to the legislative enactment of 1962. However, during the interval from the passage of the act until the new district was finally created and subsequent to its creation, but prior to the erection of facilities for carrying out the public duties of the district, the existing facilities in the county seat, Gulfport, were used for the continuation of the public's business. The chancery clerk's office there was used by the public for the recording of land deeds and similar instruments affecting property throughout the county which of course included both judicial districts. This is evidenced by the enactment of Mississippi Code 1942 Annotated section 2910-23.5 in 1968 (Supp. 1971), which is as follows:
All of the duties of all county officials performed or to be performed by any Second Judicial District created in any county under Chapter 257, General Laws of the State of Mississippi, 1962 [§§ 2910-01 et seq.], including receiving and filing of record of all instruments and documents, shall be performed by said officials in the First Judicial District of such county as if such county consisted of only one Judicial District until such time as the Board of Supervisors of such county shall by order duly passed and entered upon the minutes of said Board of Supervisors determine that a courthouse for said Second Judicial District is, or will be available. .. .[2]
All of the deeds exhibited appertaining to the title of the Redding property as conveyed to Rogers, and ultimately to the highway department, were recorded in the First Judicial District although the land lies geographically in the Second District. The office wherein the deeds were recorded was the official office by custom and by statute to receive deeds and similar instruments for recordation so that constructive notice to the public would be proclaimed by their filing. The spurious deeds of the appellant were similarly filed and thus injected into the chain of title of the property. It is contended, however, that the filing of these two instruments were acts lawful in and of themselves. Though perhaps necessary to be alleged and proven to establish *18 the ultimate consummation of the crime, they were nevertheless contended to be too insignificant to establish jurisdiction in the district where the property lies since the overt act of filing occurred in the First District. The case of Murray v. State, 98 Miss. 594, 54 So. 72 (1911), is argued as controlling. In Murray the defendant was charged with obtaining money by means of false pretenses, the result of selling cotton on which there existed a landlord's lien and of which he did not advise the purchaser. The cotton on which there was a lien was grown by the defendant on land in Claiborne County. He transported the cotton to Copiah County and sold it. The indictment was returned in Claiborne County. This Court held that Murray could not be indicted or tried in Claiborne County even though the venue sections now appearing as Sections 2419 and 2429 were then in effect. In rejecting jurisdiction in Claiborne County we stated in part:
In this case the state elected to prosecute defendant for false pretenses  that is, for selling the cotton on which there was a landlord's lien without informing the purchaser of the lien  which act alone, when proven, makes the party guilty of false pretenses, as provided for by the section of Code under which this indictment is drawn. Evidently the trial court, in assuming jurisdiction of this matter, was governed by section 1406 of Code 1906, which is quoted above. Under the facts of this case, no "acts, effects, means, or agency" occurred in Claiborne county that were essential and material to the alleged crime and requisite to its consummation. The crime of false pretense, as charged, was committed wholly in Copiah. Manifestly none of the material elements of which this crime is composed occurred in Claiborne county. Some of the evidence necessary to prove the crime as charged existed and originated in Claiborne. It would be necessary, on the trial of the case in Copiah, to prove that Vardaman had a landlord's lien on said cotton for rent, that the cotton was produced on his leased land, and that the cotton was taken, without his consent, to Copiah county, and there sold to S. Kemp, etc. All of this is a mere link in the chain of evidence necessary to establish the case of false pretenses, committed by defendant in Copiah county. (98 Miss. at 601-602, 54 So. at 73).
This quotation is seized upon by the appellant in support of his basic argument of lack of jurisdiction in the Second District. We note that the Court's opinion is expressly limited to the circumstances then existing, "for selling the cotton on which there was a landlord's lien without informing the purchaser of the lien  which act alone" since it stated: "Under the facts of this case, no `acts, effects, means, or agency' occurred in Claiborne County that were essential and material to the alleged crime and requisite to its consummation." The opinion related to a single act of not "informing" and as such is distinguished from the present situation which contains several essential steps necessary to the perpetration of the offense. Aside from this distinction we are unable to discern any controlling similarity between raising cotton in Claiborne County, not a deception, and transporting it to Copiah County, not a deception, though both might be necessary to prove the ultimate crime in Copiah County, and the present situation where two spurious deeds were filed for record in a public office for the deliberate purpose of affecting the appraisal price of property lying in the Second Judicial District. Their filing was, and surely the jury could have so found, the inducing pretense or false token necessary to the ultimate offense of obtaining the State's money by false pretenses. We are of the opinion that Murray, supra, is not controlling and that the factual situation presented is of the nature which was contemplated by the legislature when in its wisdom it enacted Mississippi Code 1942 Annotated section 2429 (1956), which states in part:
When an offense is committed partly in one county and partly in another, or *19 where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted... .
Filing the deeds in the First District initiated or "commenced" the chain of events. It had the effect, or reasonably could be found to have the effect, of raising the price of lands in the Second Judicial District so that appraisers in seeking comparaable sales would be deceived thereby. This token, if relied upon, would vest jurisdiction in the Second District.
The related question, therefore, is whether the deeds had the effect of wrongfully inflating the value of land by their use as false comparables since it is necessary to the completed offense that the false token or pretense be the moving cause by which the money or other thing of value is obtained. In State v. Freeman, 103 Miss. 764, 60 So. 774 (1913), we held it necessary to charge in an indictment for false pretenses (1) that the pretenses were false, (2) that the defendant knew them to be false, (3) that the defendant obtained from another certain money or other valuable thing, and (4) that the pretenses were the moving cause whereby the money or other valuable thing was obtained. These essentials were reiterated in Neece v. State, 210 So.2d 657 (Miss. 1968), although the elements constituting "false pretenses" were not as rigidly applied inasmuch as we held an indictment containing an allegation, "by means and color of which said false pretense ..." sufficiently charged the false pretenses to be the moving cause by which money was obtained. Though certainly "by means and color of" would be apropos here, we nevertheless are of the opinion that the more rigid standards set forth in Freeman, supra, were met by the State's evidence. First, Rogers executed the deeds knowing them to be false, a false token; secondly, he must have had knowledge of his own actions in executing the deeds; and thirdly, he did obtain the money of the State thereby; and finally, we are of the opinion as hereinafter related, that the false pretenses were the moving cause by which the money was obtained. The inducing pretense, the filing for record of the false deeds, and the consummation of the offense, the receipt of the State's money, cannot be viewed in isolation from the interwoven and intervening acts, but rather must be reviewed in context with them.
The appraisal of Dunn referred to the recorded deeds as verified and valid. It was relied upon by Stringer when he suggested to Goodwin a midway figure between that appraisal and the appraisal of Burns as the amount to be offered by Goodwin for the State in purchasing the right-of-way from Rogers. While perhaps it can be debated with some logic that Goodwin simply followed the direction of his superior rather than relying altogether upon the appraisal, it nevertheless afforded Stringer a plausible basis, albeit a deceptive one, for directing the figure. It was an effective step, or essential element, we think, in the overall scheme depicted by the evidence to obtain the money of the State by false means. Whether Dunn, Stringer or Goodwin knew the appraisal to be based upon false comparables emanating from the record needs no comment other than to say that it would seem to make little difference in view of the fact that it was acted upon. State v. Talley, 77 S.C. 99, 57 S.E. 618 (1907). Also of interest, Connor v. State, 29 Fla. 455, 10 So. 891 (1892).
However, it is further urged on the issue of jurisdiction that the appellant was unaware of Dunn's appraisal, did not use it, did not suggest a figure to Goodwin and was therefore not a party to these false tokens. Again, if we view the actions of the appellant in isolation, the argument becomes plausible. The same is usually true of a phrase or sentence that is taken out of context. We are of the opinion that the intended result of an individual's actions can only be determined by considering them in conjunction with his preceding activities as well as that which follows in order *20 to arrive at their true significance. In so doing we note that Rogers, a trained realtor, negotiated for more than a year to acquire the Redding property, borrowed a considerable sum to pay for it, and on the day he obtained title he executed the false deeds and thereafter recorded them though he later proclaimed little knowledge of the transaction and placed the responsibility for the deeds upon his co-worker Sanders. The recording nevertheless made possible the appraisal of Dunn which was used by Stringer in his order to Goodwin to make the offer to Rogers. In accepting the inflated offer based partially upon the false deeds proclaimed by the public record to be authentic, he reaped the benefit of the false token that he had sown. The recordation of these deeds was the center from which the web was woven to wrongfully ensnare the State's money. It is our opinion that the appellant cannot presently disassociate himself from his former transactions since they were "the acts, effects, means" which "commenced" the chain of events culminating in the accomplished crime of obtaining money by false pretenses. We conclude that the Circuit Court of the Second Judicial District of Harrison County had venue jurisdiction of the offense and that this assignment of error is without merit.
The appellant next argues for reversal that the lower court erred in admitting into evidence the testimony of the defendant's attorneys, Joseph Meadows and Donnie Riley, contending this to be a privileged communication within the purview of Mississippi Code 1942 Annotated section 8665 (1956) which provides in part:
It is the duty of attorneys:
(4) To maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients; ... .
We are of the opinion the evidence was not privileged since it revealed nothing given in confidence, did not involve an attorney's advice emanating from an attorney/client relationship, and in fact, related to the preparation of two deeds, the description of which was related to the secretary of the attorney. We conclude that Randel v. Yates, 48 Miss. 685 (1873), is controlling. We there stated:
As a general rule, every communication which the client makes to his legal adviser, for the purpose of professional advice or aid upon the subject of his rights or liabilities, is to be deemed confidential. But privileged communications do not extend to one acting as a mere scrivener, although of the legal profession... .
An attorney who is requested to prepare a deed or mortgage, no legal advice being required, is not privileged, and may testify as to what comes to his knowledge in connection with such transaction. And when the terms of a contract have been agreed upon between the parties, and an attorney is afterwards employed as a scrivener merely to reduce the contract to writing, and no inquiry is made of him as to its legal effect, communications made to him, while thus engaged, will not be regarded as privileged ... (48 Miss. at 689).
We find no merit in this assignment.
It is next urged that the court erred in admitting the testimony of the State to establish the value of the land acquired by the highway department since it did not follow the familiar "before and after rule" ordinarily used to establish value in condemnation proceedings. The testimony here was directed to establishing that the lands acquired by the State were much less in value than the price paid to Rogers therefor. This value was testified to by expert witnesses and in our opinion their testimony was properly submitted to the jury. We are unaware of any authority, and certainly none is cited, which requires that land values in all events must be established by the before and after rule. In Morris v. Mississippi State Highway Commission, 240 Miss. 783, 129 So.2d *21 367 (1961), this Court acknowledged that there were exceptional cases to which the rule does not apply, citing Mississippi State Highway Commission v. Hillman, 189 Miss. 850, 198 So. 565 (1940). We find no basis for declaring the admission of this evidence to be prejudicial error.
The next point argued is that the trial court erred in admitting into evidence a standard text on appraisal used by the defendant's counsel during the course of the trial which bore the name of Quentin Stringer, a co-indictee. For brevity, we simply state that we have studied the record in its entirety and conceding arguendo the introduction of this text to show that it bore the name of Stringer was error, we nevertheless are of the opinion, in view of the evidence before us, that it had no real likelihood of affecting the jury's verdict. At most it was harmless error of too little import to reverse the cause.
The next assignment is that the lower court erred in permitting the jury to separate in a felony case. The trial judge instructed the jury before they separated on the first night of the trial and before lunch the following day not to discuss the case with anyone. Each day thereafter an order was entered stating that the jury separated "under proper instructions of the court." The record does not reveal that additional instructions were given following those of the first night and the following day of the trial. The appellant now contends, due to this vacuum in the record, that no further instructions were given. We stated in Wilson v. State, 248 So.2d 802 (Miss. 1971), that reversible error was committed when the jury was permitted to separate in a capital case even with the consent of the defendant. Since that time we pointed out in Nicholson v. State, 254 So.2d 881 (Miss. 1971), that there exists a presumption that jurors carry out the instructions of the court relative to their conduct during the course of a trial and absent any evidence to the contrary, we could not say that an appellant in a felony case less than capital was prejudiced by separation of the jury. We held that before we would consider the question of error emanating from the dispersal of a jury in such cases that the point must be raised in the trial court so that it might have the opportunity to pass upon the question and in the event of an appeal all facts would then be before this Court. We are of the opinion that Nicholson is controlling and that this assignment is unavailing.
Finally, the argument is advanced that the evidence was insufficient to permit a finding of guilty and that the jury verdict was contrary to the overwhelming weight of the evidence. We have reviewed the record in its entirety and have given due consideration to the appellant's briefs, including the several hypotheses shown therein which are stated to be inconsistent with the defendant's guilt, and are of the opinion that the overall review of the record discloses ample evidence to sustain the jury's verdict and that it should be accordingly affirmed.
Affirmed.
All Justices concur except ROBERTSON, J., who took no part.
NOTES
[1] The discrepancy between the total of these checks and the sum of $174,000 is not explained by the record.
[2] By resolution of the Board of Supervisors of Harrison County the effective date for the official functioning of the Second Judicial District was designated as 12:00 Noon on the 9th day of November 1968.