473 So.2d 435 (1985)
Larry L. WALKER
v.
STATE of Mississippi.
No. 54398.
Supreme Court of Mississippi.
July 24, 1985.
*436 Percy S. Stanfield, Jr., Merrida P. Coxwell, Jr., Stanfield & Holderfield, Jackson, for appellant.
Bill Allain, Atty. Gen. by Anita Mathews Stamps, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before the court en banc.
SULLIVAN, Justice, for the Court:
Larry L. Walker was convicted in the First Judicial District of Hinds County, Mississippi, for shooting a firearm into a building usually occupied by persons and he was sentenced to serve ten years in the custody of the Mississippi Department of Corrections.

STATEMENT OF FACTS
About 12:30 a.m. on January 16, 1982, Shirley Jones saw Larry L. Walker driving a blue Ford Maverick fastback occupied by Walker and another white person identified as Kenneth Painter, a co-indictee, at or near the corner of Farish and Hamilton Streets in Jackson, Mississippi. She testified *437 that they turned on Hamilton Street, drove to the front of the Jackson Advocate, stopped and started shooting into the building. She gave a description of the two individuals, later went to police headquarters, furnished a description of Walker from which a composite picture was prepared, and then selected Walker from a group of five pictures. About two or three days later, Jones identified Walker in a line-up as the driver of the automobile. Jones later went to Walker's home and identified Walker's vehicle as the one she saw on the night of the shooting.
Thereafter, Sgt. Robert L. Campbell, a member of the Jackson Police Department, obtained a search warrant on January 12, 1982, to search appellant's residence. As a result of that search, a large assortment of guns and ammunition were seized at Walker's residence. Bullets obtained by test firing one of the guns were ballistically compared with some bullets fired into the building occupied by the Jackson Advocate. These tests showed that the gun had fired some of the bullets into the building.
Walker testified that he did not own the guns but they had been left at his home by one William Balstrup, who left a note that he would return to Walker's home in one week for the guns. The note was introduced in evidence. Walker's defense was alibi. He stated that he had gone to a tavern at 10:00 p.m. on January 15, 1982, and stayed there until he left with the owner at approximately 1:30 a.m. on January 16, 1982. Walker said he went to the owner's home where he remained until approximately 2:30 a.m., January 16, 1982. Walker denied that he fired shots into the Jackson Advocate. His alibi was corroborated by Leslie Robbins, a customer in the tavern, and the tavern owner himself, Bobby Edwards.
Sgt. Campbell signed an affidavit for a search warrant on January 21, 1982, and the magistrate issued a search warrant for Walker's residence at 3124 Whitten Road, Jackson, Mississippi. The underlying facts and circumstances sheet attached to the affidavit for search warrant follows:
UNDERLYING FACTS AND CIRCUMSTANCES SHEET
I, Sgt Bob Campbell have interviewed a black female by the name of Shirley Jones, and this subject has stated to me that she was present the night of 1-16-82 at or about 0100 hours when she observed a blue Maverick pull up in front of the Jackson Advocate Building on Hamilton Street, and fire a burst of gun fire into the front of the building.
This witness described the vehicle as a Ford Maverick, the type that is a two door sedan with a sloping rear roof known as a fast back. I have since that time of the interview found that Larry Walker, a white male who resides at 3124 Whitten Road has a vehicle fitting this description, I have taken the witness to look at this car, and she has positively identified this vehicle as the vehicle she observed on the night of the incident. This witness has also given descriptions which fits that of Larry Walker and that of Kenneth Painter, also of the same address on Whitten Road.
A confidential source has further advised me that Larry Walker does own a 30 caliber carbine of the type that was used in the incident in that evidence was found at the scene to identify this type of weapon.
Based on the above information, I request that a search warrant be issued for the above address to search for evidence in this crime, being a 30 caliber carbine rifle, semi auto matic.
 /s/ Robert L. Campbell

I.

DID THE TRIAL COURT ERR IN DENYING WALKER'S MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE?
Walker asserts that the search warrant was invalid as the affidavit did not set forth facts and circumstances from which a neutral and detached magistrate could find probable cause to issue the search warrant. He cites three deficiencies: (1) The reliability *438 of Shirley Jones, an eyewitness to the shooting, was not shown; (2) the affidavit failed to clearly indicate which of the facts alleged were hearsay or which were within affiant's personal knowledge; and (3) the confidential source mentioned in paragraph 3 of the underlying facts in the affidavit was not shown.
Walker bases his argument upon the two-prong test set forth in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). After the briefs were filed in this case, the United States Supreme Court decided Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), which abandoned the two-prong test and replaced it with the "totality of the circumstances" analysis to determine whether probable cause existed for the issuance of a search warrant.
We too have adopted the new "totality of the circumstances" analysis. In Lee v. State, 435 So.2d 674 (Miss. 1983), quoting from Gates, we said:
The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding" that probable cause existed. ....
435 So.2d at 676.
In Lee, we applied the new Gates test and determined that probable cause existed for the warrant.
Furthermore, in Hall v. State, 455 So.2d 1303 (Miss. 1984), while not relying expressly upon Gates, we stated a totality of the circumstances test and upheld the facial validity of a warrant-affidavit. 455 So.2d at 1308-09. We reaffirmed our adoption of this test in Stringer v. State, No. 54,805, February 27, 1985, not yet reported.
In accordance with these cases, we now examine the affidavit in this record to determine if the facts and circumstances set forth therein were sufficient for the issuing magistrate to make a practical, common sense decision whether, given all the circumstances in the affidavit before time, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there was a fair probability that evidence of the crime would be found at the residence of Walker.
In the first two paragraphs of the underlying facts and circumstances sheet, the affiant related the substance of an interview with an eyewitness who observed the crime, gave a description of the automobile in which the persons who fired the shots were riding, gave a description which fit that of appellant and Kenneth Painter, and identified the automobile in the presence of the officer. These facts, standing alone, were sufficient to enable the issuing magistrate to make a practical decision that there was a fair probability that evidence of the crime would be found at appellant's residence.
With reference to this part of the affidavit, appellant contends that the reliability of the eyewitness to the shooting was not shown and that this was necessary. We have considered this argument in at least three cases and have held that, when information is furnished by an eyewitness rather than from an informant, there is no need to show the party supplying the information was a credible person. Foley v. State, 348 So.2d 1034 (Miss. 1977); Holt v. State, 348 So.2d 434 (Miss. 1977); and Wolf v. State, 281 So.2d 445 (Miss. 1973). The rationale for the victim or eyewitness exception is that the statements of such eyewitnesses are based on their own observation and thus are not likely to reflect mere "idle rumor or irresponsible conjecture." The United States Courts of Appeals for the Fifth and Eighth Circuits have likewise considered the same question and reached a similar conclusion. United States v. Flynn, 664 F.2d 1296 (5th Cir.1982); United States v. Bell, 457 F.2d 1231, 1238-39 *439 (5th Cir.), appeal after remand 470 F.2d 1178 (5th Cir.1972); McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir.), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969).
In the third reason advanced by appellant for the insufficiency of the affidavit, he argues that the affidavit failed to clearly indicate which of the facts alleged were hearsay and which were within the affiant's own knowledge. He cites United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), but he can take little comfort from this case. In Vantresca, the United States Supreme Court reversed the First Circuit and disagreed with its conclusion that the affidavit might have been based wholly upon hearsay. The Court then set forth in detail the reasons for its conclusion.
The affidavit in the case before us shows clearly the facts relied upon by affiant which were hearsay and the facts which were within his personal knowledge. Accordingly, we find no merit in this contention.
In the third paragraph of the affidavit, the officer averred that a confidential source had advised him that appellant owned a.30 caliber carbine. The reliability of the informant was not stated, but this omission is not fatal because this information may be purged from the affidavit and the other remainder of the affidavit may be considered to determine if probable cause existed for issuance of a search warrant. United States v. Napoli, 530 F.2d 1198 (5th Cir.1976), and United States v. Jones, 475 F.2d 723 (5th Cir.1973).
The affidavit, omitting paragraph three, is sufficient to support issuance of a search warrant.

II.

DID THE COMBINATION OF PREJUDICIAL EXTRANEOUS MATTERS INTRODUCED BEFORE THE JURY DENY APPELLANT WALKER A FAIR AND IMPARTIAL TRIAL?
The first feature under this assignment of error is the complaint by the appellant that Charles Tisdale was allowed to put before the jury that the Jackson Advocate had been shot into prior to the occasion on which Walker is charged. At this point, it might be helpful to know that the Jackson Advocate had been fired into on one previous occasion in December and then on the occasion of this case in January. The first part of this assignment deals with the introduction of a series of photographs (Ex. 1  Ex. 8), which picture bullet holes in the glass front of the building and bullet holes on the inside of the building. The defense attorney, Mr. Stanfield, stated in the record that he had no objection to the introduction of these pictures into evidence.
Tisdale was then asked by the district attorney if any of the bullet holes were in the building prior to the January shooting. Mr. Tisdale responded that at least two bullet holes were put into the office on the night of December 19th. There was no objection. Mr. Tisdale was then asked to circle on the photographic exhibit the bullet holes that were already in the building before the January shooting. This was done without objection.
As no objection was made, this error was not preserved and there is no merit to it on appeal.
The second prong of this assignment of error deals with testimony given by Mr. Tisdale in the presence of the jury that the Jackson Advocate had printed articles against the Ku Klux Klan. Mr. Tisdale was asked what kind of articles his newspaper was running before the shooting incident of January 16, 1982. The response was that the paper had carried articles that basically point out dangerous agendas in the community that affect black people, among them a series called Klan Watch, which dealt with issues relating to black people and the Klan in the United States. In response to the next question, which was "Were those articles carried prior to January the 16th, 1982?" "A. Yes."
Mr. Stanfield objected, on the grounds that this was inadmissible unless it could *440 be specifically tied in with Mr. Walker as the defendant. Mr. Wingate informed the court that he could tie the articles to Mr. Walker, and the objection was overruled. The state failed to offer any further evidence to tie the Klan Watch articles to Mr. Walker, except that on cross-examination Mr. Walker admitted that he had once been a member of the Klan.
While it was error to admit testimony about the articles in Klan Watch, the error is not one that demands or justifies reversal of this conviction. Rogers v. State, 266 So.2d 10 (Miss. 1972); Cooley v. State, 391 So.2d 614 (Miss. 1980).
Walker also complains that, over his objection, Tisdale was allowed to testify that three men in a truck stopped his 24-year old daughter and threatened to blow her head off if Tisdale did not quit publishing the newspaper. And they also threatened Mr. Tisdale's grandson and said that he looked half-white and they did not need mongrels in Mississippi. Tisdale also testified that, because of these threats, his daughter had to leave law school and the state of Mississippi.
On cross-examination of Mr. Tisdale, defense attorney Stanfield asked:
Q. Are you saying that your newspaper, since you've been involved in it, has been a controversial type situation?
A. Well, you could say that.
Q. And you don't know  has the controversy been financial or has it been criticism or what?
A. Well, there have been both... . .
Questions in this vein continue on the cross-examination of Mr. Tisdale throughout the record.
On redirect examination of Mr. Tisdale, Mr. Wingate opened by asking Tisdale if he had ever received threats and on how many occasions he received threats. After getting affirmative responses, Mr. Wingate asked:
Q. Can you tell us about these threats?
At that point, Tisdale began an answer that dealt with three men stopping his daughter. Mr. Stanfield objected on immateriality. Mr. Wingate responded that Mr. Stanfield had opened this line of questioning and the court overruled the objection. Thereafter, a long involved answer about threats was made by Mr. Tisdale. Included in this answer were the threats to his daughter, the threats to his grandson, an ad in the newspaper selling Doberman Pinschers at a ridiculously low price and giving Tisdale's phone number as the number to call, and about phone calls one of which said, "Hey, hey, hey. KKK. We know where you live  I know where you live but you don't know where I live." and several office calls in which the caller said, "Nigger, you're dead." Mr. Stanfield then again objected on the grounds that he did not open any threats to Tisdale's daughter on his cross-examination and that it was strictly prejudicial. He also moved for a mistrial. At this point, the trial court sustained the objection and instructed the jury to disregard any part of the answer that pertained to threats to Tisdale's daughter. Mr. Stanfield then objected to the testimony concerning the Doberman Pinschers, and that objection was overruled. The motion for a mistrial was denied.
It is clear from the record that the court sustained the motion, although belatedly, and admonished the jury to disregard the testimony concerning the threats to the daughter. Any number of Mississippi cases hold that we presume the jury will follow the instructions of the court and, therefore, as to the threats to the daughter, the assignment of error is without merit. Hubbard v. State, 437 So.2d 430 (Miss. 1983); Whitlock v. State, 419 So.2d 200 (Miss. 1982); Harmon v. State, 453 So.2d 710 (Miss. 1984).
Item 3 of assignment number two raises the question of the admissibility of the evidence about the ad for the puppies that has been previously discussed. On the authority of Hubbard, Whitlock and Harmon, this assignment of error is without merit.
*441 Item 4 under the second assignment of error complains about the testimony that Tisdale received numerous calls saying, "Hey, hey, hey. KKK." and "Nigger, you're dead".
This testimony came at the conclusion of the testimony by Tisdale of the threats to his daughter and his grandchild. The trial court did not direct the jury to disregard this testimony. This testimony was not directly connected to the appellant. However, on cross-examination of Mr. Tisdale by appellant's attorney, Tisdale responded that he had talked to some of the people who had threatened them. Then Mr. Stanfield said:
Q. All right. Who 
A. Some call me up in the middle of the night and say, "We're gonna kill you, you GD nigger." So those are the kind that I've talked with.
Murphy v. State, 453 So.2d 1290 (1984), which states the rule that the door may not be opened for the entrance of hearsay, would not apply here for the Murphy case also stands for the proposition that if the testimony is merely collateral, irrelevant or otherwise damaging, you can open the door on cross-examination. Murphy cites as authority for this proposition, Reddix v. State, 381 So.2d 999 (1980), where the appellant's attorney on cross-examination introduced the subject matter of the Stilson wrench and Jefferson v. State, 386 So.2d 200 (1980), where the defendant's attorney put the defendant's prior crimes before the jury on cross-examination.
Also relied upon is Sanders v. State, 219 So.2d 913 (1969).
Therefore, these two statements are not error, and if they were error they were not reversible as hearsay under Murphy v. State.
Furthermore, from the record, it is difficult if not impossible to determine if these statements were made to Tisdale prior to the shooting on the night of January 16th, 1982, or after the shooting of January 16, 1982. It should be borne in mind that the trial was not held until September 29, 1982.
The most troubling part of the assignment of error under assignment two is the testimony on the redirect examination of Mr. Tisdale. On cross-examination, Mr. Stanfield elicited responses from Mr. Tisdale concerning then Chief Black of the Jackson Police Department. On redirect, Mr. Wingate asked the following question:
Q. Were there any articles in your paper prior to the shooting that concerned Klan activity?
BY MR. STANFIELD: Your Honor, we object as not being proper redirect.
BY THE COURT: Overruled.
A. Well, there were  are you talking about December the 4  December the 19th shooting or the January 16th 
Q. The January shooting.
A. Yes. There was an article that, in fact, I had not myself noticed, but Chief Black attributed an article carried in the 13th  in the December the 13th edition which stated that one of our employees who wrote the article wife had been threatened by a Klansman who iden  who called his house and identified themselves as a Klansman, threatening his wife's life and according to Chief Black's interpretation, the writer had issued a challenge by saying he wasn't afraid of the Klan and if they wanted to meet him man to man, he would be happy to do so. And, of course, this is what Chief Black said was the cause of the shooting.
BY MR. STANFIELD: Your Honor, of course, we object to Chief Black's interpretation. He's testifying to hearsay and he has been since Henry got him back on redirect.
BY THE COURT: Overruled. I believe you opened this up yourself, Mr. Stanfield.
BY MR. STANFIELD: I want the record to show that we have a continuing objection to this line of testimony.
BY THE COURT: You make your objections as you want them. Overruled.
There can be no question but that this testimony by Tisdale of what Chief Black said and what Chief Black interpreted was *442 rank hearsay and inadmissible. It is true that the defendant opened the question of Chief Black on cross-examination, but Murphy v. State does hold that you cannot open the door to hearsay, and the state cannot sit silently by and then rush through the open door on redirect.
However, this testimony can be readily distinguished from the hearsay testimony attempted to be used in Murphy v. State. In Murphy, the hearsay that was offered purported to reveal eyewitness testimony to the killing. No other eyewitness testimony was ever produced in that case. Such is not the case here, where the independent eyewitness testimony was presented to the jury.
There is no merit to Walker's second assignment of error.

III.

WAS THE VERDICT OF THE JURY AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
Succinctly stated the state proved by an eyewitness that Walker participated in the crime and the gun used was found in his possession. Walker claimed the gun belonged to another person, that he did not have it in his possession on the date of the crime, and that he was not at the scene of the crime.
We have held many times that the jury is the sole judge of the credibility of witnesses and the weight and worth of their Gathright v. State, 380 So.2d 1276 (Miss. 1980), are just two of our many cases stating this rule.
This assignment of error is without merit.
The conviction of Larry L. Walker and the sentence of ten years in the custody of the Mississippi Department of Corrections is affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and PRATHER and ANDERSON, JJ., concur.
DAN M. LEE, Justice, dissenting:
I respectfully dissent from the majority's opinion in this case because I believe that the admission of testimony concerning threats made to the state's chief prosecuting witness Charles Tisdale and his family and employees, as well as the admission of hearsay testimony as to Police Chief Black's opinion of the reason for the shooting were prejudicial and inflammatory and prevented the defendant from receiving a fair trial.
At issue in this case was the single question of whether Larry Walker did willfully and unlawfully shoot into the office of the Jackson Advocate on the night of January 15, 1982 and only evidence which would tend to prove or disprove that issue was relevant to this case. In criminal cases where the state has attempted to introduce evidence of prior crimes or bad acts of the defendant, we have repeatedly held that, with a few exceptions, such evidence is inadmissible. Tobias v. State, 472 So.2d 398 (Miss. 1985); Hughes v. State, 470 So.2d 1046 (Miss. 1985); Gallion v. State, 469 So.2d 1247 (1985); Eubanks v. State, 419 So.2d 1330 (Miss. 1982); Massey v. State, 393 So.2d 472 (Miss. 1981); Floyd v. State, 166 Miss. 15, 148 So. 226 (1933). As we stated in Floyd:
The reason and justice of the rule is apparent, and its observance is necessary to prevent injustice and oppression in criminal prosecutions. Such evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and, while the accused may be able to meet a specific charge, he cannot be prepared to defend against all other charges that may be brought against him. `To permit such evidence,' says Bishop, `would be to put a man's whole life in issue on a charge of a single wrongful act, and crush him by irrelevant matter, which he could not be prepared *443 to meet.' 1 Bish.Crim.Proc. sec. 1124.
166 Miss. at 35, 148 So. at 230.
In this case, the state went even farther than the introduction of prior crimes of the defendant. Over objections by defense counsel, Charles Tisdale, the publisher of the Jackson Advocate, testified about threats made against him, his daughter, his two-year-old grandson, an employee of the newspaper, and another employee's wife. The state never connected these threats with the defendant. Far beyond suggesting that some prior bad act of the defendant intimated that he was inclined to commit the crime, the state suggested that prior bad acts committed by some unidentified person showed that the defendant shot into the office of the Jackson Advocate. This testimony was irrelevant to the issue of the defendant's guilt, and, with the inclusion of a death threat made against a two-year-old child, highly inflammatory and prejudicial.
The actual testimony was as follows:
Q. Can you tell us about these threats?
A. Well, the last major one that concerned me was  well, there were two major ones that concerned me that happened in the last three months. One of them was that three men stopped my twenty-four year old daughter 
BY MR. STANFIELD: Your Honor, this is interesting, but it's immaterial and I object.
BY MR. WINGATE: He started it, Your Honor. He asked 
BY THE COURT: I believe you opened it up, Mr. Stanfield. Overruled.
A. Stopped my twenty-four year old daughter in a pickup truck and had a sawed off shotgun and pulled it on her and told her that if I didn't quit publishing that nigger newspaper that they were going to blow her brains out and that they knew where she had  where she kept my grandson, my two year old grandson and he looked like he was half white and they didn't  they didn't need any mongrels in Mississippi and you let your daddy know that. And they subsequently called her at home and at the law school where she attended, which was Mississippi College of Law until she was forced to leave the school and leave the state for her own safety because of continued threats. The second incident was someone placed an ad in the Daily News and Clarion Ledger which said that I had some Doberman pinscher puppies for sale and to only call after some hour late at night and the phone rang for  they were  the dogs were on sale for some ridiculously low price, like $5.00 apiece, you know, pure registered Doberman pinscher and the phone rang all night and all day for at least a week. And the next thing that happened when my phone was listed in the phone book, the same day that the phone book came out, I got a call from someone who said  how did they have it  "Hey, hey, hey. KKK. We know where you live  I know where you live but you don't know where I live." And several times we've gotten calls at the office saying, "Nigger, you're dead."
Q. Did you 
BY MR. STANFIELD: Your Honor, we again object to this. It was not  he brought out threats on his daughter that I did not bring out. It's strictly to prejudice this jury and we move the Court to declare a mistrial.
BY THE COURT: Members of the Jury, you're to disregard  I sustain the objection and disregard that part of the answer pertaining to threats to his daughter and 
BY MR. STANFIELD: And the pretty little puppy dogs, Your Honor, couldn't have anything to do with the threat.
BY THE COURT: Overruled. Do all of your [sic] tell me that you will disregard that portion that I instructed you to disregard? Any of you that cannot do that?
(NO RESPONSE BY JURORS.)
BY THE COURT: Thank you. Motion for a mistrial denied. Move along.
Although the objection to the introduction of this testimony was partially sustained, and the jury instructed to disregard *444 it, that instruction does not lessen the overall prejudicial effect of this evidence. As in Howell v. State, 411 So.2d 772, 777 (Miss. 1982), "The actions of the trial court were not sufficient to cure the error." We held in that case, quoting from McDonald v. State, 285 So.2d 177, 180 (Miss. 1973) that:
It is error in the course of a trial where one is charged with a criminal offense for the state to inject extraneous and prejudicial matters and lay them before the jury. A combination of such instances may become fatal error and ground for reversal even though the court sustains objections to such questions... . One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case. Expressing it another way, the question of guilt or innocence of the crime charged should be received by the jury unhampered by any suggestion or insinuation of any former crime or misconduct that would prejudice jurors... . We commend vigorous prosecutions so long as they are conducted within the rules of evidence. Our adversary system of jurisprudence does not contemplate that attorneys for either side will be completely passive or indifferent during court trials. Yet, fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us. See Allison v. State, 274 So.2d 678 (Miss. 1973); Kelly v. State, 278 So.2d 400 (Miss. 1973); and Wood v. State, 257 So.2d 193 (Miss. 1972).
This trial concerned itself with the firing into a building on the night of January 16, 1982, not with threats made by an unidentified caller to chief prosecution witness Tisdale in no way connected with Walker, during the preceding months and year. If it can be said that the Ku Klux Klan may have been involved in the threats made to Tisdale, his daughter or to his employees, which Klan member made the threats? The Klan was not on trial, Larry Walker was.
This Court has dealt with such collateral inflammatory, and irrelevant testimony in Wood v. State, 257 So.2d 193 (Miss. 1972) wherein Chief Justice Patterson quoted from Coleman v. State, 198 Miss. 519, 23 So.2d 404 (1945) the following:
In Coleman v. State, 198 Miss. 519, 522-523, 23 So.2d 404, 405 (1945), a case of attempted arson, Justice Griffith, in commenting upon the motive for the attempted arson, established by the witnesses to be jealousy, it appearing that the appellant was intensely enamored of a man believed by her to be in the house with another woman, motivating her to burn the house, stated:
We do not pursue the details except to say that at points in this record it is difficult to tell whether the prosecution was for the attempted arson laid in the indictment, or whether for unlawful cohabitation, or whether the arraignment was for immorality in general.
Appellant's counsel vigorously objected to all this collateral and excessive matter, and repeatedly did so without avail. Incompetent evidence pressed upon the jury as this was, especially if of an inflammatory character, is presumed to have been harmful, and it is only when we can say with confidence that it had, in all probability or likelihood no such effect that we may decline to reverse on account of it. This record does not present a case so conclusive of guilt that we may assume to say that what was done here was of no harm, with the result that the judgment must be reversed and the case remanded for a proper trial.
These questions were prejudicial, requiring prejudicial answers, and being repeatedly pressed upon the jury, deprived the defendant of due process of law, necessitating a reversal of the case.
257 So.2d at 199-200.
Such is the case here. It is hard to tell whether Walker was being tried for someone's threatening the state's chief prosecuting *445 witness, his newspaper, daughter, his two-year old grandson; someone's shooting into the newspaper office one month before, or being a former member of the Ku Klux Klan in the distant past. This incompetent testimony was so inflammatory and prejudicial, "[in] character [that it] is presumed to have been harmful," Wood v. State, supra at 200. Therefore, we cannot say with confidence that it had no such effect upon the jury, depriving the defendant of due process of law, Brooks v. State, infra; Lisenba v. California, infra.
The defendant was further prejudiced when the prosecution delved further into the subject of threats in the testimony that followed immediately:
Q. Again, keeping with counsel's questions about threats against you 
BY MR. STANFIELD: Your Honor, I 
Q.  or your paper 
BY MR. STANFIELD:  didn't  Your Honor, I object to him referring to 
BY THE COURT: Rephrase your question, Mr. Wingate. Sustained.
Q. Do you know whether any employees of yours had threats against them?
A. Yes.
BY MR. STANFIELD: Your Honor, we object to that. It's not proper redirect.
BY THE COURT: Overruled.
Q. Can you tell us about those?
A. Yes, one of the young ladies, Carol Parker, had threats by someone calling her and telling-telling her that she was dead.
BY MR. STANFIELD: Your Honor, we object to him testifying to rank hearsay. It's obvious it's hearsay.
BY THE COURT: Overruled. I'm not admitting it for the truth of the statement. Move along.
Q. Were there any articles in your paper prior to the shooting that concerning Klan activity?
BY MR. STANFIELD: Your Honor, we object as not being proper redirect.
BY THE COURT: Overruled.
A. Well, there were  are you talking about December the 4  December the 19th shooting or the January 16th 
Q. The January shooting.
A. Yes. There was an article that, in fact, I had not myself noticed, but Chief Black attributed an article carried in the 13th  in the December 13th edition which stated that one of our employees who wrote the article  wife had been threatened by a Klansman who iden  who called his house and identified themselves as a Klansman, threatening his wife's life and according to Chief Black's interpretation, the writer had issued a challenge by saying he wasn't afraid of the Klan and if they wanted to meet him man to man, he would be happy to do so. And, of course, this is what Chief Black said was the cause of the shooting.
BY MR. STANFIELD: Your Honor, of course, we object to Chief Black's interpretation. He's testifying to hearsay and he has been since Henry got him back on redirect.
BY THE COURT: Overruled. I believe you opened this up yourself, Mr. Stanfield.
BY MR. STANFIELD: I want the record to show that we have a continuing objection to this line of testimony.
BY THE COURT: You make your objections as you want them. Overruled.
The defendant could have made two objections to this evidence; first, that it was hearsay, and second, that it was irrelevant. The court ruled on the hearsay objection by asserting that the defense had "opened it up." However, as we made clear in Murphy v. State, 453 So.2d 1290, 1294 (Miss. 1984):
There is no hearsay exception based upon the scope of examination. You may allow its admission by failing to object to it, but you simply cannot "open the door" to hearsay. Hearsay is incompetent evidence. You may open the door for collateral, irrelevant, or otherwise damaging evidence to come in on cross-examination, *446 Reddix v. State, 381 So.2d 999 (Miss. 1980); Jefferson v. State, 386 So.2d 200 (Miss. 1980); Sanders v. State, 219 So.2d 913 (Miss. 1969), but Mississippi recognizes no rule of law that allows double hearsay to be brought in through this open door.
Aside from being hearsay, the purported statement by Chief Black was also irrelevant. Tisdale testified that, in Chief Black's opinion, the shooting was in retaliation for an article written in the Jackson Advocate about the Ku Klux Klan. No attempt was made to connect this hearsay to the defendant.
When combined with the admission of the testimony regarding the death threats made to Mr. Tisdale and others, "the pyramiding of this evidence against the appellant placed upon him a burden too heavy to bear under the circumstances of the case and deprived him of a right to a fair trial." Massey v. State, 393 So.2d 472, 475 (Miss. 1981).
We have, in several cases, allowed exceptions to the general rule that evidence of other crimes is inadmissible. Exceptions are warranted:
[W]here the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. Such proof of another crime is also admissible where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.
Neal v. State, 451 So.2d 743, 759 (Miss. 1984). See also, Mason v. State, 429 So.2d 569 (Miss. 1983); Woods v. State, 393 So.2d 1319 (Miss. 1981); Floyd v. State, 166 Miss. 15, 148 So. 226 (1933). This case does not involve evidence offered as part of the res gestae. Davis v. State, 431 So.2d 468 (Miss. 1983); Johnson v. State, 416 So.2d 383 (Miss. 1982); Gray v. State, 375 So.2d 994 (Miss. 1979). Nor is it a situation in which the evidence is admissible to prove motive. We have not required proof of motive in cases involving murder, Maiben v. State, 405 So.2d 87 (Miss. 1981); rape, Massey v. State, 393 So.2d 472 (Miss. 1981); or embezzlement, Boteler v. State, 363 So.2d 279 (Miss. 1978). Indeed, proof of motive "becomes important only when the evidence, direct and circumstantial, fails to make out a satisfactory case." 21 Am.Jur. Criminal Law, § 133 (1981). In the case sub judice, the state cannot assert the admissibility of evidence as to prior threats to prove motive for two reasons: first, the threats were never connected to the defendant so as to be relevant to his motivation; and, second, ample evidence existed, in the form of eyewitness testimony and the defendant's possession of the weapon used to commit the crime, to place the defendant at the scene without the use of inflammatory, prejudicial and irrelevant testimony.
The court instructed the jury to disregard Mr. Tisdale's testimony about the threats to his daughter. However, when the defense counsel objected to the testimony regarding threats to Mr. Tisdale's employees and Chief Black's statements, the court overruled the objection. When combined, this testimony created an ominous mantle of suspicion, which came to rest on the defendant's shoulders and denied him a fair trial.
The Court has long recognized that:
It is a well-settled general rule that the issue on a criminal trial should be single and that the testimony should be confined to that issue and on the trial for one offense and prosecution should not be allowed to aid the proof against the defendant by showing he committed other offenses, even though of a like nature. Cummings v. State, 219 So.2d 673 (Miss. 1969); Ladnier v. State, 254 Miss. 469, 182 So.2d 389 (1966); Brown v. State, *447 224 Miss. 498, 80 So.2d 761 (1955); Pegram v. State, 223 Miss. 294, 78 So.2d 153 (1955); Floyd v. State, 166 Miss. 15, 148 So. 226 (1933).
Sumrall v. State, 257 So.2d 853, 859 (Miss. 1972).
The court and the district attorneys in this case chose to ignore that "well-settled rule" and introduce irrelevant, inflammatory and prejudicial evidence. Even more frustrating is the fact that the evidence was introduced needlessly, in a situation in which the relevant, admissible evidence pointed toward conviction. District attorneys would do well to heed the words written by Justice Thomas H. Woods in Hill v. State, 72 Miss. 527, 534-35, 17 So. 375, 377 (1895):
The fair way is the safe way, and the safe way is the best way in every criminal prosecution. The history of criminal jurisprudence and practice demonstrates, generally, that if every one prosecuted for crime were fairly and fully conceded all to which he is entitled, and if all doubtful advantages to the state were declined, and if adventurous forays into dangerous or unknown fields were shunned, and if the beaten paths were heedfully followed, there would be secured as many convictions of the guilty, and such convictions would be succeeded by few or no reversals.
The right to a fair trial is a fundamental right which should be guaranteed to every criminal defendant in every court. Because the trial of Larry Walker violated the standards set out in Sumrall, 257 So.2d 853; Wood v. State, 257 So.2d 193; Cummings, 219 So.2d 673; Ladnier, 182 So.2d 389; Brown, 80 So.2d 761; Pegram, 78 So.2d 153; Brooks v. State, 46 So.2d 94; Floyd, 148 So. 226; and Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 85 L.Ed. 166, this case should be reversed and remanded for a new trial.
HAWKINS and ROBERTSON, JJ., join in this opinion.